Present:  All the Justices

CARDELL LAMONT AVENT

v.  Record No. 090537   OPINION BY JUSTICE DONALD W. LEMONS
                                 January 15, 2010
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Cardell Lamont Avent ("Avent") was convicted by a jury on

charges of first-degree murder in violation of Code § 18.2-32

and use of a firearm in the commission of a felony in

violation of Code § 18.2-53.1.  In this appeal, we consider

multiple assignments of error arising from these convictions.

I.  FACTS AND PROCEEDINGS BELOW[1]

On August 17, 2005, police officers in Brunswick County,

Virginia, responded to a call for a "welfare check" on William

David Thomas, Jr. ("William"), whom the caller had not seen in

several days.  Upon arriving on William's property, Major Brian

Roberts ("Major Roberts") testified at trial that he detected a

"very strong odor, like a dead carcass."  Once inside William's

residence, Major Roberts saw blood stains throughout the house:

"in the bathtub," "in . . . the victim's bedroom upstairs," and

"on the steps."  When William's body was not located inside his

_____

[1] Avent was tried separately from Meloni Thomas
("Thomas"), who was also charged and convicted for her
participation in the crimes.  See Thomas v. Commonwealth, 279
Va. ___, ___ S.E.2d ___ (2010) (this day decided).  Neither
Avent nor Thomas testified at the other's trial.  As a result,
the evidentiary records in the two trials are inconsistent.

residence, the deputies searched the curtilage of his property. The search led the officers to a "chicken coop" that had a "wood door" with "a cinderblock on the ground against it." Once deputies removed the cinderblock and opened the door, there was a "completely overwhelming," "unbelievable odor."

Immediately inside the chicken coop, officers encountered "a black fender well" and "blue plastic foam insulation." Upon removing those items, "a head of a human being was exposed, and flies just swarmed." Major Roberts testified to finding a "very, very badly decomposed body." He described the head, later identified through dental records as William's, as having "[p]art of the face almost looked like it melted off or rotted off."

Captain Kent Washburn[2] ("Captain Washburn") also testified to the presence of blood throughout the house, on walls, the bathtub, and floors. In the bucket for the well outside William's home, Captain Washburn discovered a "soiled shirt that appeared to have stained blood on it, and there was a hole in the chest area." Officers also recovered a comforter, a sheet to a bed, and gun parts from the well. The bed in

---

[2] Captain Kent Washburn was referred to in the Thomas and Avent records as both "Captain Washburn" and "Lieutenant Washburn." For the purpose of consistency, we will refer to him as "Captain Washburn" in both this opinion and in Thomas v. Commonwealth, 279 Va. ___, ___ S.E.2d ___ (2010) (this day decided).

William's bedroom had no sheets on it, and there were "ammonia and bleach bottles" in his bedroom. A piece of the gun had "gr[a]y duct tape" on it and the name "Winchester."

After receiving a "Crime Solver's tip," Major Roberts and Captain Washburn traveled to the Navajo County Jail in Kayenta, Arizona, where they encountered Avent and Thomas, daughter of decedent William; both Avent and Thomas were "people of interest in this murder case." During their time together, Major Roberts observed no injuries on Avent. Captain Washburn interviewed Avent and testified that Avent's demeanor during the interviews was "[v]ery calm; no signs of being nervous or upset; showed no emotion; no signs of crying; and basically, did not ask anything about the Thomas family."

Over two days of interviews, Captain Washburn advised Avent of his Miranda rights and had Avent sign a written Miranda waiver. Captain Washburn obtained "three written statements" from Avent, one in Avent's own handwriting, the other two in question-and-answer format transcribed by Captain Washburn, which detailed Avent's involvement in William's death. Avent signed each page of his statements. Captain Washburn made an audio recording of the last statement Avent

gave on the first day of interrogation in Arizona. During the trial the audio recording was played for the jury.[3]

Prior to trial, Avent made a motion to suppress the statements he gave in Arizona to Captain Washburn and Major Roberts on the grounds that the statements were made involuntarily. Major Roberts, Captain Washburn, and Avent each testified at the hearing on the motion to suppress.

Major Roberts testified that Avent was neither threatened nor offered leniency in exchange for his cooperation. Captain Washburn testified that the interrogation lasted "roughly three and a half hours, four hours. It was on and off, after [Avent] had been given breaks" to use the restroom and to have something to drink. Avent was fed dinner and never complained of discomfort.

Major Roberts was only present for the "initial meeting," in which Avent was given Miranda warnings and made his first verbal statement. Major Roberts "got disgusted" with the "lies" Avent told the officers during the first interview and so Major Roberts "got up and walked out and went back to interview" Thomas.

Avent described himself during the interrogation as "calm" and "comfortable." Avent further testified that he had

_____

[3] Neither the transcript of the audio recording nor the recording itself were made a part of the record in this

been given food and an opportunity to sleep, and he was given his Miranda rights.  He testified that while he understood the rights, he did not waive those rights until after his interrogation.  Avent said he was "scared" after Major Roberts "got so mad that he slammed his hand down on the table and told  me . . . if I didn't cooperate with him . . . that they were going to charge my ass with capital murder and that's a life or death sentence."

Avent testified that the officers never touched him, and he did not feel threatened or scared by Captain Washburn.  On a number of occasions during the hearing, Avent responded that he understood what was occurring during the interrogation.  At the conclusion of the testimony, the trial court denied the motion to suppress, finding that there was "no threat of a murder charge, no threat of physical harm, [and] no promises of leniency."  Further, the trial court found that Avent was "a man of at least average intelligence," Avent himself said "he was comfortable [during the interrogation]," and Avent "never complained about his comfort or any physical discomforts."

Avent also made a Batson motion, arguing that the Commonwealth's exercise of all five of its peremptory strikes on African-American potential jurors was racially motivated in

appeal.

5

violation of <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986). Avent is African-American.  In particular, Avent challenged two of the strikes exercised by the Commonwealth:  Frema Draughn ("Draughn") and Chiquita Easter ("Easter").

The Commonwealth gave two reasons for the strike of Draughn.  The first was that her son was "recently stopped in a traffic stop and had marijuana," but he was not charged. The second was that both Draughn and her father had an affiliation with Saint Paul's College, and the Commonwealth noted that there was "friction" between the Commonwealth and the college because the Commonwealth "tr[ies] to prosecute some of [its] students" and its "chief of security was recently arrested for sex crimes."  However, during voir dire, Draughn indicated that while her father had worked with "Saint Paul's security," he was "currently deceased."  Avent argued that Draughn's son's alleged marijuana possession had nothing to do with her, and he noted that the affiliation with the college was a "positive rather than negative."

The Commonwealth also cited two reasons for its strike of Easter.  First, during voir dire "she appeared to be sleeping."  Second, she "has been sued multiple times in civil matters, owes money," and she indicated on her intake form that she had a disability, but the Commonwealth was unclear of what that disability was.

6

The trial court denied Avent's Batson motion, holding that all five strikes were made for "facially valid race-neutral reasons" and Avent failed to demonstrate that the Commonwealth's race-neutral reasons were "mere [pretext] and not supported by the evidence."  The trial court then impaneled the jury, and began the trial.

At trial, Captain Washburn read Avent's written statements into evidence.  In Avent's hand-written statement, Avent stated that he, Thomas and her three children went to William's house so Thomas could "get her checks."  Thomas entered William's house "[t]hrough a window on the porch.  She moved the storm door and went inside through a window."  His narrative continued:

> [Thomas] went in the house to get her checks.  I heard arguing, so I went in the house.  Next thing I know, I was hit.  I falled [sic] down on the floor while still being hit. I, Cardell, looked up and it was her father. He then put his hands around my neck and started choking me.  I was afraid for my life. I started wiggling trying to get away.

> He stopped and went upstairs.  I followed behind him slow to see what he was doing.  When I got upstairs, I was hit with a board a few times.  Once again, I was afraid for my life, so I turned my head away, at the same time, pulled out the gun and shot it one time; not noticing where I was shooting at, I just wanted him to stop hitting me.  I turned back around, and he was running towards me still, so I took the gun and only hit once.  He was still fighting me, so I kept on hitting him until he stopped.  [Thomas] then came upstairs.

7

> I was scared, so we dragged him outside to the shed. I then went to the car to check on the kids. After I checked on the kids, I went to see what [Thomas] was doing. She was cleaning up. I wiped off a few things, I can't remember what they are, and then we left. Got to North Carolina, she gave her checks to John, and we came to Arizona.

In response to Captain Washburn's questions, Avent estimated that the altercation with William occurred "between August 7th and the 11th of 2005" at "around 1:00 P.M. or 2:00 P.M." Avent said that he followed William upstairs because he "was mad, because [William] had choked [him]." Avent "wanted to tell [William] that [William] was wrong for hitting [Avent] and tell him why [Avent] was down the[re], but [William] kept hitting [Avent]." When Avent got upstairs, William "swung a board at [Avent] and kept on swinging." Avent told Captain Washburn that he was "bleeding somewhere on [his] head" as a result of the fighting with William.

Avent stated that he hit William in the face three to five times with the barrel of a sawed-off shotgun. After he stopped hitting William, Avent "was leaning up against the wall and [his] head was hurting." Avent acknowledged that he assisted Thomas in removing William's body from the house, stating that he "was tired and help[ed] her drag the best I could, but [Thomas] did most of the dragging."

8

Avent described the shotgun as an old, two-foot long, single-barrel Winchester with gray duct tape on it. When asked about the gun's whereabouts, Avent answered that he "threw some pieces in the wood[]s while we were riding down the road. I threw them out of the car window, somewhere in North Carolina." Avent also threw away a black hooded-type jacket that he was wearing during the assault.

In the statements recorded by Captain Washburn, Avent asserted that Thomas had placed the gun parts, bed sheet, comforter, and towels in the well, Thomas put William's body in the shed and covered him up with the black fender well, and Thomas closed the shed door and put a brick behind the door. Avent stated that he had "never shot [the gun] until that day at [William's] house."

During the interviews, which took place approximately two weeks after William's body was recovered, Captain Washburn photographed portions of Avent's body that Avent identified as being injured. Captain Washburn was not able to "see any visible injury" either on Avent's head where he contended he bled after being hit by a board, or on his neck where he claimed William had choked him. Captain Washburn did observe a "bruise on [Avent's] left arm and also a mark on his left leg," both of which were the size of a dime or smaller. Avent said the injuries to his arm and leg came from "the struggle."

9

Captain Washburn recovered various pieces of wood around the crime scene, including one in the well, which were "only . . . small pieces of wood," about "the size of two fingers put together."

Other people saw Avent shortly after the incident. John Bass ("Bass") testified that he met Avent and Thomas at a fast food restaurant in Roanoke Rapids, North Carolina on the day in question in response to Thomas' request that he cash a check for her. Bass got within "15, 20" feet of Avent and he did not notice any visible signs of injury or anything that suggested that he was injured. Tami Rose saw Avent in Arizona on approximately August 14th. She did not notice any injury to Avent.

Lieutenant Reeder Nez ("Lt. Nez") of the Department of Criminal Investigation for the Navajo Nation, in Kayenta, Arizona, testified that Kayenta, Arizona, is "really a remote area" located on the Navajo reservation. On September 1, Lt. Nez went to a residence in Arizona where he found Avent. Lt. Nez testified that Avent neither seemed injured nor emotional in any way.

Crime scene investigators testified about the state of William's house. Special Agent Thomas Embry was responsible for the exterior crime scene. He testified that the distance from William's house to where the body was discovered was 123

feet.  Forensic scientist James Bullock testified that the wood and metal pieces recovered from the scene of the crime came from the shotgun admitted into evidence.

A forensic expert, Marjorie E. Harris, testified that "a blood source [underwent forcible] events in the threshold of [William's] bedroom, and [blood flew] out into the hallway." She observed "so much [blood] that it actually drained through the holes in the floor."  There was blood spatter indicating trauma both while the victim was upright, and while he was supine.  She concluded that the blood patterns in William's room were consistent "with one sequence of events where the injury begins in the northeast corner with the blood source high.  The blood source is mobile, travels, ends up in the threshold of the door, is now low, and then is consequently moved out of the bedroom . . . across the hallway, down the steps."

Dr. Bill Gormley ("Dr. Gormley"), Assistant Chief Medical Examiner, testified that the cause of William's death "was certified as blunt force injury to the head."  William's skull had "comminuted fractures of the . . . facial skeleton [and] rare small metallic foreign bodies."  William had sustained a fracture of the right radius, and his chest contained multiple small fragments of metal.  Dr. Gormley testified that William was missing portions of his skull due to the extensive

fractures and decomposition, and William's lower mandible was dramatically displaced. Dr. Gormley concluded that the shotgun wound or wounds were not necessarily lethal, but rather William died from the blunt force trauma to his skull.

At the close of the Commonwealth's evidence, Avent made a motion to strike on three separate grounds: (i) Avent acted in self-defense as a matter of law, (ii) the Commonwealth failed to prove sufficient evidence of premeditation, and (iii) the Commonwealth failed to prove murder and therefore the trial court should reduce the homicide charge to voluntary manslaughter and strike the use of a firearm charge. The trial court denied the motion to strike on all three grounds.

Regarding Avent's claim of self-defense, the trial court stated that "[o]nce the defendant pursued the decedent up the stairs, he lost the defense of justifiable homicide." Likewise, the trial court ruled the defense of excusable homicide unavailable because of Avent's failure to retreat from the place of the attack. The trial court noted "[i]t was at the very door where the defendant had the opportunity to extricate himself from the difficulty where the deadly force used by the defendant took place." Accordingly, the trial court denied Avent's motion to strike on the basis of self-defense.

12

With regard to Avent's contention that the Commonwealth failed to prove premeditation, the trial court noted that in this case, Avent inflicted a nonfatal wound on William, and "thereafter inflicted multiple blunt force trauma sufficient to . . . cause [William's] death." Accordingly, the trial court concluded that the Commonwealth established a prima facie case of premeditation.

Finally, the trial court found Avent's motion to strike the charges of first- and second-degree murder unavailing. The trial court noted that malice may be presumed by the use of a deadly weapon, and in this case Avent had used the shotgun both as a firearm and a bludgeon. Accordingly, the trial court denied Avent's motion to strike.

Prior to the presentation of defendant's case-in-chief, Avent proffered testimony regarding his state of mind during the altercation that led to William's death. Avent sought to testify about the effect that statements made by William to Thomas had on Avent's state of mind at the time of the incident. Avent contended that prior to the altercation, Thomas told him that William "didn't like black people, that he didn't approve of her dating black men, and he didn't approve of her kids being . . . of mixed races." Avent asserted that he was present when William told Thomas that Avent was not

13

allowed on his property because William "didn't like [Avent or] the color of [his] skin."

The trial court found Avent's proffered testimony inadmissible for several reasons. First, the court determined it was hearsay because it was being offered to prove William's alleged racism. Second, it was inadmissible because it was irrelevant: William's "views on race relations [we]re not an issue" in the case and were therefore collateral. Finally, there would be no opportunity to cross-examine William — and likely no opportunity to cross-examine Thomas — regarding the statements. Additional argument followed the trial court's ruling, after which the trial court commented that William's statements were "so removed in time and so irrelevant to this case that the Court believes they have no probative value."

Avent then testified on his own behalf. Avent testified that he had smoked an entire six-inch "blunt" of marijuana and consumed a 32-ounce bottle of Colt 45 beer approximately "30, 35 minutes before" he arrived at William's house. Avent stated that he was "pretty much high" when he arrived at William's house, and he was intoxicated during the assault.

Avent testified that he and Thomas, along with Thomas' three sons, had gone to William's house to get Thomas' checks. Thomas entered the house and was inside for "10 or 15 minutes" when Avent heard "arguing" and a "loud bang noise." Avent

14

claimed that he retrieved the shotgun from the trunk of the car and brought the gun into the house concealed in his pants in response to the "loud banging noise," and because he was "paranoid" and "scared" as a result of "smoking [marijuana] and drinking [alcohol]" Avent testified that he went into "the house to get [Thomas] out of the house before she get herself into any trouble or whatever." Avent stated that he did not plan on killing, assaulting, or injuring William when he entered the house.

According to Avent, William attacked him and struck him multiple times in the face with "his fist and his hand" once Avent entered from the outside into the kitchen. Avent also asserted that William said, "Nigger, what are you doing in my house?" while he was striking Avent. Avent claimed that William hit Avent three times "at the most" and choked him as well. Avent stated that William's attack "put fear in [him]. [He] was scared and [he] was mad" because he felt William was "really going to hurt" him, and because he thought William was attacking him "just because of the color of [his] skin."

When the choking ceased, William "got up and he said, 'I got something for you.' " William then "turned around . . . and started going towards the stairs and up the stairs." Avent testified that he "had a good idea that [William] was going to get a gun." Avent followed William "upstairs behind him to

15

stop him and tell him I wasn't there to fight him" because he was aware that Thomas' sons were in the car and Avent "wasn't going to go out to the car and put the kids' life on the line."

Avent claimed that once Avent got upstairs, William "hit [him] in the back of [his] head . . . [w]ith a board" which caused bleeding from "the back left of [his] head."  Avent testified that he "got madder and madder" because he "was telling [William] the whole time" William was hitting him that Avent "wasn't there to fight him."  In addition to the injury to his head, Avent stated that he suffered injuries "on both of [his] arms . . . as far as knots and swelling" and "knots and swelling and a bruise on [his] left leg, too."

Avent testified that he was "holding up [his] arms" to protect himself from William, and finally drew the shotgun because he "just got so mad that [William] kept on hitting" him and because he "was scared of [William] possibly taking [his] life and hurting" him.  Avent stated that when he fired the shotgun at William, William was "30 feet" away from Avent. Avent was unable to answer whether William was "moving towards" him or away from him when Avent shot him.  Avent asserted that he "just pulled out the gun, turned [his] head away and shot" the gun.

After Avent shot William, a fight ensued.  Avent testified that William "still came towards" Avent and William "was

16

swinging." Avent testified that he "got madder and madder, so I hit him back hard one time. He fell down on the floor, and I just continued to hit him" with the barrel of the gun. William fell after Avent hit him one time, and Avent stated "I think he lost or he dropped the board as soon as he fell and hit the floor" and he never regained possession of the board. Avent testified that while William was on the ground, Avent "was bending over," striking him with the shotgun. Avent stated that after he stopped hitting William, Avent "had got overheated and blacked out, and [he] fell to the floor."

Avent asserted that he was dazed for a "split-second," and when he regained consciousness, he helped Thomas remove William's body from the house because he was scared. He also took the board William used to hit him because he was scared and "wanted to get rid of the evidence that was there." Avent and Thomas were cleaning up the scene for approximately "30 minutes" and they then left together, first for North Carolina and then Arizona.

Avent conceded that he had not been truthful when he told investigators that he had never fired the shotgun prior to that time, stating that he "simply forgot." Avent added that during his interrogation, Major Roberts had threatened him with a capital murder charge if he did not cooperate and as a result Avent was scared and "in like a shock state or zone." Avent

also contended that most of his injuries had healed by the time the officers interviewed him in Arizona.

On cross-examination, Avent conceded that on the audio recording, the final question asked was whether Avent "had anything else at all to say about what had happened." Despite that opportunity, Avent admitted that during the interrogation he made no mention of the loud banging noise, his use of drugs or alcohol, William's use of a racial slur, the threat Major Roberts allegedly made to him, or Avent's disposal of the board he alleged William had used to attack him. On several occasions in his testimony, Avent responded that there were a number of things he and Captain Washburn had discussed that were not in his written statements.

At the close of all the evidence, Avent renewed his motion to strike on the following grounds: (i) the Commonwealth's case should be struck on the grounds of self-defense, (ii) his intoxication negated the element of premeditation and therefore the charge of first-degree murder should be struck, and (iii) the Commonwealth's evidence only supported a conviction of voluntary manslaughter and therefore the use of a firearm in the commission of a felony should be struck. The trial court denied Avent's renewed motion to strike.

The trial court held that Avent was not entitled to a defense based on justifiable self-defense because Avent

18

followed William upstairs after the initial altercation had ended.  Nor was Avent entitled to a defense based on excusable self-defense because he failed to "retreat as far as he safely could under the circumstances," he did not make a "good-faith attempt to abandon the fight," and he "used more force than was reasonably necessary to protect himself from the threat of harm."

The trial court found that Avent's voluntary intoxication was not sufficient "to render him incapable of premeditation" and accordingly denied Avent's motion to strike on that basis. The trial court further noted that "the facts taken in the light most favorable to the Commonwealth have not changed significantly" from the time of Avent's previous motion to strike the charges of first- and second-degree murder, therefore "they are still proper charges for the trier of fact to consider."  Accordingly, the trial court denied Avent's motion to strike on that basis.

Avent proffered the following jury instruction on justifiable self-defense:

> If you believe that the defendant was without
> fault in provoking or bringing on the
> difficulty, and if you further believe that the
> defendant reasonably feared, under the
> circumstances as they appeared to him, that he
> was in danger of being killed or that he was in
> danger of great bodily harm, then the killing
> was in self defense, and you shall find the
> defendant not guilty.

19

The trial court refused to give this instruction, holding that the "evidence does not exist to grant the instruction as a matter of law" because "the defendant used more force than was reasonably necessary to protect himself from threat and harm." The trial court also noted that Avent's statements about being angry "lead[] into manslaughter, but also to a great extent, vitiate[] self-defense."

Among other instructions, the trial court gave the jury instructions on first-degree murder, second-degree murder, and voluntary manslaughter. The jury was also given an instruction on voluntary intoxication: if Avent was "so greatly intoxicated by the voluntary use of alcohol and drugs that he was incapable of deliberating or premeditating, then you cannot find him guilty of murder in the first degree." The jury found Avent guilty of first-degree murder and use of a firearm in the commission of murder.

During the penalty phase, Avent objected to the following argument made by the prosecutor:

> The cruelty and the brutality of that murder
> has to be punished, and what does he deserve as
> punishment for that? He deserves to spend
> every day of the rest of his natural life in
> prison.
>
> Now, the second thing that I'd ask that
> you consider, not only as punishment for him,
> but the second thing is to look at the danger
> he would pose if he wasn't in prison because if

20

> you do anything else less than life, anything less, then one day he's going to walk out of that prison cell, and he's going to come back in this society.

Avent moved for a mistrial based on "improper and inappropriate" argument. The trial court denied Avent's motion for a mistrial, and overruled his objection on the ground that "the Commonwealth ought to be able to argue restraint." The jury recommended a sentence of life imprisonment plus three years.

Following his conviction, Avent made a motion for a new trial based on after-discovered evidence. At a hearing on the motion, Deborah Burkett ("Burkett"), a social work supervisor with the Brunswick County Department of Social Services, testified that "10, 12 years ago" a "child protective service complaint" was received regarding the victim, William. The complaint was initially filed by "somebody within the community who [William's wife] had gone to."

Burkett testified that there was a letter indicating that William "had abused his wife and that social services assisted her in moving to federal housing." There was also "a complaint being made of [William] being accused of beating his toddler boys with switches." Record of this complaint had been "expunged from [the] agency" having "surpassed the timeframe to be retained." Apart from that complaint, William's wife on

21

"numerous later occasions [] presented [William] as being a very loving, caring, father/husband."  Burkett testified that she had not heard of any reputation in the community for violence on the part of William.

The Commonwealth conceded at the hearing that it had not discovered this information until after the trial and after it had exercised due diligence.  Additionally, the Commonwealth admitted that the evidence was not cumulative or collateral because "there was no other evidence of any reputation of violence or prior acts of violence."

At the conclusion of the hearing, the trial court determined that the proffered after-discovered evidence "almost certainly would not have produced an opposite result at trial." The trial court reached this result in part because it had decided that "the defendant could not avail himself of a self-defense instruction."  Additionally, the trial court expressed doubt that the evidence would be admissible.

Avent timely filed his notice of appeal, and the Court of Appeals, per curiam, denied by unpublished order his petition for appeal.  Avent v. Commonwealth, Record No. 2941-07-2 (October 21, 2008).  A three-judge panel affirmed the denial of Avent's appeal.  Avent v. Commonwealth, Record No. 2941-07-2 (February 26, 2009).  Avent timely filed his notice of appeal

and we awarded an appeal on the following ten assignments of error:

1. The Court erred in refusing to grant the defense counsel's Motion to Suppress his statements on the grounds that they were not voluntary.
2. The Court erred when it denied defense counsel's Baston [sic] motion.
3. The Court erred by refusing to allow in evidence of the defendant's state of mind as it pertained to the defenses of voluntary manslaughter and self-defense.
4. The Court erred in refusing to grant the defense counsel's Motion to Strike on the basis that the defendant acted in self-defense.
5. The Court erred in refusing to grant the defense counsel's self-defense jury instruction.
6. The Court erred in failing to find the defendant guilty of voluntary manslaughter, and in failing to thus, acquit him of use of a firearm.
7. The Court erred in failing to grant defense counsel's motion for a mistrial on the basis of improper argument at the penalty phase by the Commonwealth.
8. The Court erred by denying the defense counsel's motion for a new trial based on after-discovered evidence.
9. The defendant should have been acquitted of first degree murder as the element of premeditation was negated by intoxication.
10. The Court erred when it found that there was sufficient evidence to find that the defendant premeditated, as to support a conviction for first degree murder.

## II.  ANALYSIS

### A.  PRE-TRIAL ISSUES

#### 1.  Motion to Suppress

Avent argues that it was error for the trial court to deny his motion to suppress the statements he made to the officers in Arizona because the statements were obtained in a

23

manner that "arguably falls under coercive police activity due to the duration of time that [Avent] was held and questioned, and the threatening remarks that were made to him."

### a. Standard of Review

"The standard of review for determining whether a defendant's confession was voluntary is well-established . . . Voluntariness is a question of law, subject to independent appellate review." Midkiff v. Commonwealth, 250 Va. 262, 268-69, 462 S.E.2d 112, 116 (1995.) "Subsidiary factual questions, however, are entitled to a presumption of correctness." Id. at 268, 462 S.E.2d at 116 (citations omitted).

### b. Analysis

"If the suspect's will has been overborne and his capacity for self-determination critically impaired, the confession is considered involuntary and its use is unconstitutional." Id. (citation and quotation marks omitted).

> The test to be applied in determining
> voluntariness is whether the statement is
> the 'product of an essentially free and
> unconstrained choice by its maker,' or
> whether the maker's will 'has been overborne
> and his capacity for self-determination
> critically impaired.' Schneckloth v.
> Bustamonte, 412 U.S. 218, 225 (1973). In
> determining whether a defendant's will has
> been overborne, courts look to 'the totality
> of all the surrounding circumstances,' id.
> at 226, including the defendant's background
> and experience and the conduct of the

> police, Correll v. Commonwealth, 232 Va.
> 454, 464, 352 S.E.2d 352, 357 (1987).

Midkiff, 250 Va. at 268, 462 S.E.2d at 116 (quoting Burket v. Commonwealth, 248 Va. 596, 611, 450 S.E.2d 124, 132 (1994)).

The record in this case, which includes Avent's own testimony, indicates that his will was not overborne and his capacity for self-determination was not impaired. Avent was apprised of his Miranda rights by the interrogating officer, he was given food and an opportunity to sleep, and he described himself as "calm" and "comfortable" throughout the questioning.

The trial court, acting as the fact-finder, found that there was "no threat of a murder charge, no threat of physical harm, [and] no promises of leniency." Further, the trial court found Avent to be "a man of at least average intelligence," thereby capable of understanding the nature of his interrogation, a fact to which Avent agreed in his testimony.

Recognizing as we did in Midkiff that "[a]ll police interviews of suspects have coercive aspects to them by virtue of the fact that the interrogating officer is part of a system which may ultimately charge the suspect with a crime," 250 Va. at 269, 462 S.E.2d at 117, nothing in the record before us requires a reversal of the trial court's denial of Avent's motion to suppress. The trial court properly assessed whether Avent's will was overborne under the circumstances, and

25

credited the officers' testimony — a factual determination to which we accord deference.  Accordingly, the trial court did not err when it denied Avent's motion to suppress.

## 2.  Batson Motion

Avent contends the trial court erred when it denied his Batson motion.

### a.  Standard of Review

"On appellate review, the trial court's conclusion regarding whether reasons given for the strikes are race-neutral is entitled to great deference, and that determination will not be reversed on appeal unless it is clearly erroneous."  Jackson v. Commonwealth, 266 Va. 423, 437, 587 S.E.2d 532, 543 (2003).

### b.  Analysis

> When a defendant raises a challenge based on
> Batson, he must make a prima facie showing that
> the peremptory strike was made on racial
> grounds. At that point, the burden shifts to
> the prosecution to produce race-neutral
> explanations for striking the juror. The
> defendant may then provide reasons why the
> prosecution's explanations were pretextual and
> the strikes were discriminatory regardless of
> the prosecution's stated explanations. Whether
> the defendant has carried his burden of proving
> purposeful discrimination in the selection of
> the jury is then a matter to be decided by the
> trial court.

Id. at 436, 587 S.E.2d at 542.

In this case, it was incumbent upon Avent to demonstrate that the reasons advanced by the Commonwealth for striking these potential jurors "were purely a pretext for unconstitutional discrimination," Juniper v. Commonwealth, 271 Va. 362, 407, 626 S.E.2d 383, 412 (2006). On appeal, Avent only focuses upon two jurors.

The trial court found that the Commonwealth offered "facially valid race-neutral reasons" for the exercise of its strikes, and at that point the burden shifted back to Avent. Avent did not offer any evidence or argument that the Commonwealth's proffered rationale behind the two strikes challenged in this appeal were pretextual. Accordingly, the trial court was not clearly erroneous in denying Avent's Batson motion.

### B.   GUILT PHASE ISSUES

#### 1.   Evidence of Avent's State of Mind

Avent argues that the trial court erred when it ruled that certain statements made by William to Thomas, later relayed to Avent, were inadmissible.

#### a.   Standard of Review

> Generally, we review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion.

*John Crane, Inc. v. Jones*, 274 Va. 581, 590, 650 S.E.2d 851, 855 (2007).

### b. Analysis

Avent asserts that his proffered testimony regarding William's disapproval of African Americans was "relevant and a material issue" to his case, namely the impact this information had on Avent's "mental state, as to reasonable provocation, heat of passion, and self-defense claims." We disagree with Avent and hold that the trial court did not abuse its discretion when it excluded Avent's proffered testimony. The trial court found that the statements William made to Thomas were "so removed in time and so irrelevant to this case that the Court believes they have no probative value." "[A] great deal must necessarily be left to the discretion of the [trial court], in determining whether evidence is relevant to the issue or not. Evidence is relevant if it has any logical tendency to prove an issue in a case." Id. (Citation and quotation marks omitted).

Regarding Avent's claim of reasonable provocation, we have held that "provocation cannot be relied upon to reduce murder in the second degree to manslaughter, unless the provocation has so aroused the anger of the assailant as to temporarily affect his reason and self-control." *Jacobs v. Commonwealth*, 132 Va. 681, 685, 111 S.E. 90, 92 (1922).

In this case, the trial court found William's alleged statements "so removed in time" as to be irrelevant to the issue of reasonable provocation. We agree. Accordingly, we hold that the trial court did not abuse its discretion when it excluded Avent's proffered testimony as irrelevant.

### 2. Motions to Strike

At the conclusion of the presentation of all the evidence, Avent made several motions to strike. Avent contends that it was error for the trial court to deny his motion to strike the Commonwealth's case on the basis of self-defense. In the alternative, Avent argues that the trial court erred when it denied his motion to strike the charge of first-degree murder on the grounds that his voluntary intoxication negated the element of premeditation, and his motion to strike the charges of first- and second-degree murder on the basis that the evidence only supported a charge of voluntary manslaughter. Avent further contends that if the charges of first- and second-degree murder were struck, the trial court was required to strike the charge of use of a firearm in the commission of a felony.

### a. Standard of Review

We review the trial court's ruling denying the motion to strike in accordance with well-settled principles:

> When the sufficiency of [the
> Commonwealth's] evidence is challenged
> by a motion to strike, the trial court
> should resolve any reasonable doubt as
> to the sufficiency of the evidence in
> the [Commonwealth's] favor and should
> grant the motion only when it is
> conclusively apparent that [the
> Commonwealth] has proven no cause of
> action against defendant, or when it
> plainly appears that the trial court
> would be compelled to set aside any
> verdict found for the [Commonwealth] as
> being without evidence to support it.

Banks v. Mario Indus., 274 Va. 438, 454-55, 650 S.E.2d 687, 696 (2007) (quoting Saks Fifth Ave., Inc. v. James, Ltd., 272 Va. 177, 188, 630 S.E.2d 304, 311 (2006)).

### b.  Analysis

#### i.  Self-defense

Avent asserts that it was error to deny his motion to strike the Commonwealth's evidence on the grounds that he acted in self-defense as a matter of law.  Viewing the evidence in the light most favorable to the Commonwealth, the party opposing the motion to strike at trial, we hold that the trial court did not err when it denied Avent's motion to strike based upon self-defense.

"Killing in self-defense may be either justifiable or excusable homicide.  Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under

30

reasonable apprehension of death or great bodily harm to himself." Yarborough v. Commonwealth, 217 Va. 971, 975, 234 S.E.2d 286, 290 (1977) (emphasis added) (quotation marks omitted).

The trial court correctly held that Avent's own statements to the police prohibit him from the benefit of self-defense as a matter of law. In Avent's handwritten account of the events, he stated that William "stopped [hitting Avent] and went upstairs. [Avent] followed behind him slow to see what he was doing." In response to Captain Washburn's question, Avent said that he followed William upstairs because he "was mad, because [William] had choked" him.

By Avent's own account, an angry Avent followed William upstairs in William's home, following an altercation, and carrying a sawed-off shotgun. Based on the evidence, Avent was not "without any fault on his part in provoking or bringing on the difficulty." Id. Accordingly, the trial court did not err when it denied Avent's motion to strike based on justifiable self-defense.

The trial court denied Avent's motion to strike based on excusable homicide due to Avent's failure to retreat from the scene of the altercation and his use of excessive force.

> Excusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm.

Id.

As recounted above, rather than exit from the first-floor of the house to his parked vehicle, Avent followed William upstairs. Once upstairs, William allegedly hit Avent in the back of the head with a board. Avent then shot William from a distance of "30 feet." Avent testified that William "still came towards" him and so Avent hit him one time, a blow that caused William to fall to the floor and lose control of the board. It was at that point that Avent, on his feet, beat a prone and unarmed William to the point that William's skull was dramatically disfigured, the shotgun was broken into pieces, and Avent himself was exhausted from the violence of the attack.

Avent's own testimony reveals that he did not "retreat[] as far as possible." Id. Additionally, when William — without a weapon and wounded by a shotgun — was on the ground after a blow from Avent, Avent was not acting out of a "reasonably apparent necessity to preserve his own life." Id. Accordingly, the trial court did not err when it denied

32

Avent's motion to strike on the basis of excusable homicide in self-defense.

## ii. Voluntary Intoxication

The trial court denied Avent's motion to strike the charge of first-degree murder on the basis of his voluntary intoxication. We hold that the trial court did not err when it submitted the question of voluntary intoxication to the jury.

Jury instruction number 12A read:

> If you find that the defendant was so greatly intoxicated by the voluntary use of alcohol and drugs that he was incapable of deliberating or premeditating, then you cannot find him guilty of murder in the first degree.
>
> Voluntary intoxication is not a defense to murder in the second degree or voluntary manslaughter.

Viewing the evidence in the light most favorable to the Commonwealth, there was sufficient evidence to support the finding that Avent was not "so greatly intoxicated . . . that he was incapable of deliberating or premeditating." See Wright v. Commonwealth, 234 Va. 627, 629, 363 S.E.2d 711, 712 (1988) ("Mere intoxication will not negate premeditation.")

The facts adduced at trial indicate that Avent provided a detailed recollection of the chronology of events to the investigating officers, and again in his trial testimony. Avent testified to entering Thomas' house carrying a shotgun

33

"to protect" himself after he "heard a loud banging noise." Avent followed Thomas upstairs "telling him the whole time that I wasn't there to fight him, I just wanted to get his daughter and go," rather than flee from the house because he "wasn't going to go out to the car and put the kids' life on the line." Avent also testified that when Thomas assaulted him, he "was afraid he was really going to hurt me, and [Avent] was mad at the same time because [Thomas] was attacking [Avent] because of the color of [Avent's] skin." Following William's death, a "scared" Avent worked with Thomas to move the body and clean the house.

From Avent's own testimony, it is clear that on the day in question Avent comprehended what was occurring, he recalled the chain of events, and he articulated reasons for his reaction to the developing situation in a way that supports a finding that he was capable of deliberation despite his consumption of intoxicants. Accordingly, the trial court did not err when it denied Avent's motion to strike the charge of first-degree murder on the grounds that he was voluntarily intoxicated.

### iii.  Voluntary Manslaughter

The trial court denied Avent's motion to strike the charges of first- and second-degree murder, holding that Avent's use of the shotgun as a deadly weapon made the charges

34

of first- and second-degree murder appropriate.  Avent contends the trial court erred when it determined that the evidence supported the greater charges.

"Generally, whether a killing was done in the heat of passion upon reasonable provocation is a jury question." Barrett v. Commonwealth, 231 Va. 102, 106, 341 S.E.2d 190, 192 (1986).  "Manslaughter . . . is the unlawful killing of another without malice."  Jenkins v. Commonwealth, 244 Va. 445, 457, 423 S.E.2d 360, 368 (1992).  Malice may be inferred "from the deliberate use of a deadly weapon unless, from all the evidence," there is reasonable doubt as to whether malice existed.  Smith v. Commonwealth, 239 Va. 243, 263, 389 S.E.2d 871, 882 (1990).  A "common theme running through [the definitions of malice] is a requirement that a wrongful act be done wilfully or purposefully."  Essex v. Commonwealth, 228 Va. 273, 280, 322 S.E.2d 216, 220 (1984) (quotation marks omitted).

In this case, Avent admitted to purposefully using a sawed-off shotgun both to shoot and bludgeon William. Therefore, there was sufficient evidence from which the jury could infer malice, and the charges of first- and second-degree murder were properly before the jury.  Accordingly, we hold that the trial court did not err when it denied Avent's motion to strike those charges.  For the same reasons, the

35

trial court did not err when it failed to strike the charge of use of a firearm in the commission of a felony.

### 3. Self-Defense Jury Instruction

Avent argues that the trial court erred when it refused to instruct the jury on his proffered self-defense jury instruction.

#### a. Standard of Review

> Because the trial court refused to grant the instruction proffered by the accused, we view the facts in the light most favorable to the defendant.  However, an instruction is proper only if supported by more than a scintilla of evidence.  If the instruction is not applicable to the facts and circumstances of the case, it should not be given.  Thus, it is not error to refuse an instruction when there is no evidence to support it.

Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001) (citations omitted).

#### b. Analysis

The trial court refused Avent's proffered instruction, ruling "as a matter of law, . . . the defendant used more force than was reasonably necessary to protect himself from threat and harm."  Additionally, the trial court found that "[o]nce the defendant pursued the decedent up the stairs, he lost the defense of justifiable homicide."

Under either account of the events given by Avent – his trial testimony or his statements made to investigators – he

36

forfeited his right to a self-defense jury instruction because he was not without fault in bringing on the difficulty that resulted in William's death, and he was not in reasonable fear of death or great bodily harm when he killed William. Accordingly, viewing the evidence in the light most favorable to the accused, we hold that the trial court did not err when it refused Avent's proffered jury instruction on justifiable homicide.

"If a defendant is even slightly at fault, the killing is not justifiable homicide." Perricllia v. Commonwealth, 229 Va. 85, 94, 326 S.E.2d 679, 685 (1985). While there are inconsistencies in Avent's account of the events, he consistently stated that the alleged altercation between himself and William ended when William went upstairs. Avent stated that during William's alleged assault, William used a racial epithet, and that when William ascended the stairs, Avent believed he was going to retrieve a gun. Despite this obvious hostility toward Avent and despite the fact that his vehicle was available outside, mere steps from where he entered William's house, Avent pursued William upstairs carrying a shotgun. We hold that the trial court did not err in ruling that Avent was not entitled to a justifiable homicide jury instruction due to his fault in bringing on the difficulty by pursuing William upstairs.

37

Assuming arguendo that Avent was not at fault when he followed William upstairs, or when he discharged the shotgun, we agree with the trial court that at the instant Avent applied lethal force he was not "under reasonable apprehension of death or great bodily harm to himself." Yarborough, 217 Va. at 975, 234 S.E.2d at 290. Avent's own account of the events reveals the following chronology: William attacked Avent with a board, Avent shot William one time, William continued his attack, and then Avent "hit him back hard one time" with a blow strong enough to knock William to the floor and the board from his hand.

At that moment, Avent stood astride William who was wounded from a gunshot and on the floor without a weapon — hardly a position that evokes "reasonable apprehension of death or great bodily harm to himself." Id. Despite William's prone and wounded position, Avent proceeded to bludgeon him repeatedly with the barrel of the gun, conduct to which the medical examiner ascribed William's cause of death. Consequently, we hold that under the circumstances, Avent's use of force was not reasonable to justify killing William. The trial court did not err when it refused to grant Avent's proffered self-defense jury instruction.

4. Motion for New Trial

38

Avent contends that it was error for the trial court to deny his motion for a new trial on the basis of improper argument at the penalty phase of the trial. Avent asserts that the argument "appealed to the jury's passion, and that the case should be remanded for new trial as to punishment."

### a. Standard of Review

We apply an abuse of discretion standard of review to the trial court's determination of whether the Commonwealth's argument was objectionable.

> Sometimes it is difficult to draw the line between proper and improper comments, hence the general rule is to leave such distinction largely to the discretion of the trial court, whose ruling will be allowed to stand unless it is made to appear probable that the party complaining has been substantially prejudiced by the objectionable remarks or argument.

McLean v. Commonwealth, 186 Va. 398, 401, 43 S.E.2d 45, 47 (1947).

### b. Analysis

Avent is correct that a "prosecutor's request . . . must not appeal . . . to the jurors' passions by exciting their personal interests in protecting the safety and security of their own lives and property." Hutchins v. Commonwealth, 220 Va. 17, 19, 255 S.E.2d 459, 460-61 (1979). However, the language of which Avent complains does not violate that standard.

39

During the penalty phase, the prosecutor said:

> Now, the second thing that I'd ask that
> you consider, not only as punishment for him,
> but the second thing is to look at the danger
> he would pose if he wasn't in prison because if
> you do anything else less than life, anything
> less, then one day he's going to walk out of
> that prison cell, and he's going to come back
> in this society.

This case is distinguishable from Hutchins.  In Hutchins,
during a trial held in Franklin County, the prosecutor made
specific, repeated reference to the safety and security of the
jurors during closing argument.  Id. at 18, 235 S.E.2d at 460.
At one point, the prosecutor stated, "[t]his case is about the
security of Franklin County property owners."  Id.  Later, the
prosecutor asked,

> What message are you going to send out to the
> people of Franklin County?  Are you going to
> send out, 'Come on down.  It's down there.
> It's yours for the picking.  We don't care.  We
> don't think it's serious.  We're going to slap
> him on the wrist and turn him loose.'

Id. at 19, 235 S.E.2d at 460-61.  We assessed the prejudice of
such an argument by noting:

> What this argument does is create an atmosphere
> wherein a defendant may be convicted and
> punished, not just for the offense on trial,
> but to set an example to deter some unknown
> future criminal activity by some as yet
> unidentified outside criminal actor. The
> potential harm in such an argument is that it
> tends both to inflame a juror's natural
> prejudice against an outsider entering his
> jurisdiction for criminal purposes and to
> divert the juror's attention from the evidence

40

> produced at trial and focus it upon extraneous
> and inadmissible matters.

Id. at 20, 255 S.E. 2d at 461.

In this case, there was no reference to potential criminal offenses by others. Based upon our review of the record, we cannot say that Avent was "substantially prejudiced" by the prosecutor's statement during the sentencing phase of his trial. See McLean, 186 Va. at 401, 43 S.E.2d at 47. Accordingly, we cannot find that the trial court abused its discretion when it denied Avent's motion for a new trial based on improper argument.

## C. POST-TRIAL ISSUES

### 1. After-Discovered Evidence

Avent argues that the trial court erred when it denied his motion for a new trial based on after-discovered evidence.

#### a. Standard of Review

A motion for a new trial based on after-discovered evidence "is a matter submitted to the sound discretion of the circuit court and will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented." Orndorff v. Commonwealth, 271 Va. 486, 501, 628 S.E.2d 344, 352 (2006).

#### b. Analysis

41

"Motions for new trials based on after-discovered evidence are . . . not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance." Odum v. Commonwealth, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983). See Garnett v. Commonwealth, 275 Va. 397, 416-17, 657 S.E.2d 100, 112 (2008); Commonwealth v. Tweed, 264 Va. 524, 528-29, 570 S.E.2d 797, 800 (2002). The moving party

> bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

Id. The moving party "must establish each of these mandatory criteria." Garnett, 275 Va. at 417, 657 S.E.2d at 112.

In this case, the Commonwealth conceded that the first three criteria have been satisfied. The trial court, without deciding whether the first three criteria were satisfied, ruled that if this after-discovered evidence had been available at trial, "there is virtually no likelihood that it would have produced the opposite result." We agree with the trial court and hold that it did not abuse its discretion in reaching this conclusion.

42

As the trial court correctly noted, there is doubt whether the after-discovered evidence would be admissible at trial. "[W]here an accused adduces evidence that he acted in self-defense, evidence of specific acts is admissible to show the character of the decedent for turbulence and violence, even if the accused is unaware of such character." Barnes v. Commonwealth, 214 Va. 24, 25, 197 S.E.2d 189, 190 (1973). However, this statement of the law has been qualified. "[T]he ultimate issue becomes whether such evidence of prior conduct was sufficiently connected in time and circumstances with the homicide as to be likely to characterize the victim's conduct toward the defendant." Id. at 26, 197 S.E.2d at 190. "A single act of bad conduct does not establish one's unfavorable character. While evidence of a series of bad acts may collectively be admissible to establish poor character, the conduct in a single incident is insufficient." McMinn v. Rounds, 267 Va. 277, 282, 591 S.E.2d 694, 697 (2004).

The after-discovered evidence in this case was not connected in time or circumstances with the homicide. The accusations introduced at the hearing are between 10 and 12 years before the killing, and they involve domestic conduct, not a confrontation of the type Avent alleges occurred on the day in question.

Assuming arguendo that the evidence would be admissible at a new trial, it would not be likely to alter the outcome. Even armed with the new evidence, Avent's statements to the police and his trial testimony precluded him, as a matter of law, from the benefit of a jury instruction on self-defense. Additionally, the jury had before it Avent's account of the events that included William's alleged use of provocative language and physical assault. The jury rejected Avent's account and the addition of a decade-old allegation would not likely "produce opposite results on the merits at another trial." Garnett, 275 Va. at 417, 657 S.E.2d at 112. We hold that the trial court did not abuse its discretion when it denied Avent's motion for a new trial based on after-discovered evidence.

### 2. Motion to Set Aside the Verdict

Avent assigns error to the trial court's denial of his motion to set aside the jury's verdict and the sentencing order on the grounds that there was insufficient evidence of premeditation to support a finding of first-degree murder.

### a. Standard of Review

"When reviewing the sufficiency of the evidence to support a conviction, the Court will affirm the judgment unless the judgment is plainly wrong or without evidence to

44

support it." Bolden v. Commonwealth, 275 Va. 144, 148, 654

S.E.2d 584, 586 (2008).

### b. Analysis

> [T]he question whether a defendant is guilty of
> a premeditated killing of the victim is usually
> a jury question. The intention to kill need
> not exist for any specified length of time
> prior to the actual killing; the design to kill
> may be formed only a moment before the fatal
> act is committed provided the accused had time
> to think and did intend to kill.
>
> . . . .
>
> To premeditate means to adopt a specific intent
> to kill, and that is what distinguishes first
> and second degree murder. The intent to kill
> must come into existence at some time before
> the killing; it need not exist for any
> particular length of time.

Remington v. Commonwealth, 262 Va. 333, 352, 551 S.E.2d 620,

632 (2001) (citations and quotation marks omitted).

> In deciding [whether premeditation and
> deliberation exist], the jury may properly
> consider the brutality of the attack, and
> whether more than one blow was struck, the
> disparity in size and strength between the
> defendant and the victim, the concealment of
> the victim's body, and the defendant's lack of
> remorse and efforts to avoid detection.

Epperly v. Commonwealth, 224 Va. 214, 232, 294 S.E.2d 882, 892

(1982) (citations omitted). Viewing the evidence in the light

most favorable to the Commonwealth, there was sufficient

evidence for the jury to find that Avent committed

premeditated, first-degree murder.

Avent entered William's house only after Thomas had entered through a window, and he did so carrying a concealed, sawed-off shotgun. Following a skirmish on the first floor, Avent gave several different reasons for following William upstairs, among them Avent's anger towards William. Once upstairs, Avent shot and then brutally bludgeoned an unarmed William to the point that William's skull collapsed. Avent used such violent force that afterward he was "leaning up against the wall and [his] head was hurting" and the gun was broken into pieces.

Following the assault, Avent and Thomas tried to conceal William's death by cleaning up blood, hiding or discarding evidence, dragging William's body to an out-building and covering it, then fleeing to a remote settlement on the Navajo Reservation in Arizona. When he was interviewed in Arizona, Avent "showed no emotion" and "did not ask anything about the Thomas family." Despite Avent's claims that William attacked him, no witness that saw Avent following the alleged attack was able to identify any injuries to him.

The record reveals a brutal attack where, after the victim was shot, more than one blow was struck, and the defendant attempted to conceal the crime and avoid detection, and expressed no remorse for the killing. Accordingly, there was ample evidence to support the jury's finding of

premeditated killing in the first degree.  Therefore, the trial court did not err when it denied Avent's motion to set aside the verdict on the grounds that there was insufficient evidence to support a finding of premeditation.

### III.  CONCLUSION

For the foregoing reasons, we will affirm the judgment of the Court of Appeals.

<u>Affirmed.</u>