COURT OF APPEALS OF VIRGINIA

Present:  Judges O'Brien, Ortiz and Senior Judge Humphreys
Argued at Lexington, Virginia

JAMES ELLIOTT FITCH

v.      Record No. 1981-23-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE DANIEL E. ORTIZ
SEPTEMBER 24, 2024

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Claude V. Worrell, II, Judge[1]

(Bryan Jones; Bryan J. Jones, LLC, on brief), for appellant.
Appellant submitting on brief.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


James Elliott Fitch appeals his convictions, following a jury trial, for first-degree murder,

use of a firearm in commission of a murder, and possession of a firearm after having been

convicted of a felony, in violation of Code §§ 18.2-32, -53.1, and -308.2.  On appeal, Fitch

argues that the trial court erred when it denied his motion to suppress and that the evidence was

insufficient to support his first-degree murder conviction.  Finding no trial court error, we affirm

the convictions.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Judge Claude V. Worrell, II, presided at Fitch's jury trial and sentenced him.  Judge
Cheryl V. Higgins presided at the hearing on Fitch's motion to suppress and denied it.

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

## I. The Shooting and the Investigation

Yvette Fitch (Yvette) and Fitch had a tumultuous marriage and after many fights and reconciliations, the pair separated in the spring of 2020. In late 2020, Yvette worked as a home healthcare assistant helping Kathleen Hoffman care for her husband.[2] The Hoffmans lived at 5403 Wingspread Lane in Albemarle County. The Hoffman home was located a quarter of a mile from the road at the end of a private lane and was not visible from Wingspread Lane. Over the course of Yvette and Fitch's marriage, Fitch had been to the Hoffmans' home many times.

On the evening of November 21, 2020, Yvette was working at the Hoffmans' home. Based on the caller identification system on the Hoffmans' landline phone, Fitch called the Hoffmans' residence at 7:18 p.m. At 9:15 p.m., Yvette took her usual smoke break just outside the residence's front door. As Yvette smoked, Hoffman prepared her husband for a shower. While walking down the front hallway, Hoffman saw Yvette through the frosted-glass front window sitting on the raised flower bed. Suddenly, two arms extended toward Yvette's head with a gun and Hoffman heard a gunshot; Hoffman immediately called 911. At trial, Hoffman noted that in the minutes before the gunshot, she had not heard a vehicle approach the house, an argument outside, or Yvette cry out for help.

At 9:33 p.m., Albemarle County Police Officer Anna Rumsey responded to a report of a shooting at 5403 Wingspread Lane. Upon arriving, Officer Rumsey observed Yvette sitting on a flower bed leaning against the door frame. After a brief sweep of the area, Officer Rumsey

---

[2] Mr. Hoffman's first name was never disclosed at trial.

called out to Yvette, but Yvette did not answer.  As Officer Rumsey approached Yvette, she noticed that Yvette did not appear to be breathing and had a substantial amount of blood on her face, shoulder, and arm.  Yvette had sustained two small caliber gunshot wounds to the head, and she was pronounced dead at the scene.

The medical examiner concluded that Yvette died of two gunshot wounds to the head.  Both bullets traveled from left to right at a downward angle.  The first bullet entered Yvette's left cheek and traveled through the facial structure to her right shoulder.  The second bullet entered five inches above Yvette's left ear and traveled through a portion of her brain and struck the base of Yvette's skull.  Officers did not recover any bullet casings at the scene.

Officers recovered Yvette's phone near her body and three Michelob Ultra beer cans halfway down the private drive.  The beer cans were tested for DNA but the cans contained too few DNA types for analysts to compare them to Fitch's DNA.  Both Ariel Morton, Fitch's friend, and Wanda Hawkins, Fitch's sister, acknowledged that Fitch would drink a lot and that his drink of choice was a Michelob Ultra.

On November 22, 2020, Fitch called Detective Andrew Holmes to ask about the investigation into Yvette's death.  Fitch agreed to come to the police station to speak with Holmes.[3]  Initially, Fitch asserted that he had not left his residence on November 21, 2020.  Later, he admitted that he had left his home, claiming he had gone to the store to buy beer but had immediately returned home.  During the interview, Fitch asserted that Yvette was cheating on him and that he had video evidence of her adultery.  Fitch claimed that Yvette had put the video on his phone and that he was angry with her for doing that.  At the conclusion of their interview, Holmes seized Fitch's phone.

---

[3] The recorded interview was played for the jury.

Hawkins picked Fitch up from the police station after his interview with Holmes. While driving home, he told Hawkins that he had hidden a gun in the park next to his residence; he instructed Hawkins to retrieve the gun and hide it somewhere else. Fitch denied killing Yvette. Instead of retrieving the firearm, Hawkins told the police where the gun was located.

Officers recovered a loaded .22 caliber revolver wrapped in a white tee-shirt from Jordan Park, about 500 feet from Fitch's residence at 521 Rougemont Avenue. Upon examination, officers discovered that two of the recovered revolver's six bullets had been expelled. The empty casings, however, were not sequential; an intact cartridge with a firing pin mark on the rim of the casing was located between the two expended casings. This sequence suggested to officers that the trigger had been pulled three times, but the middle cartridge misfired. Forensic analysis of the weapon indicated that this revolver fired the bullets recovered from Yvette's body. Fitch could not be eliminated as a major contributor to the DNA profile on the revolver. Morton identified the recovered revolver as Fitch's gun.

When officers extracted data from Yvette's phone, they learned that Yvette had blocked Fitch's phone number on November 11, 2020. Still, Yvette's phone indicated that she had called Fitch at 7:20 p.m. and at 8:14 p.m. on November 21, 2020.

Analysis of Fitch's phone indicated that he had sent hundreds of messages to Yvette between August and November and that she contacted him less than 50 times. Phone records showed that, on November 21, 2020, Fitch texted Yvette, but those messages did not appear on Fitch's messaging app. Ultimately, the deleted messages were recovered in unallocated space in Fitch's phone. The messages contained sentiments of love for Yvette as well as anger over Fitch's belief that Yvette had been unfaithful. Fitch threatened to go "to court and show what [he] ha[d]," asserted that Yvette's "shit [wa]s going to come to light," and said that "karma [wa]s

- 4 -

going to get [her]." In Fitch's internet search history, officers discovered divorce-related inquires as well as searches about breaking news in Charlottesville.

Finally, officers found on the phone the video Fitch believed depicted Yvette engaged in a sexual act. The video had been opened 25 times and re-saved into different photos. Fitch had shown the video, as well as still images extracted from it, to multiple people. Others told Fitch that they did not believe the video depicted Yvette. Fitch, however, could not be convinced that Yvette was not the woman in the video. Scott Mayo, Fitch's employer, testified that Fitch was frustrated with Yvette and that Fitch had once said that "[Yvette] was going to make [Fitch] kill her."

Analysis of historical cell site data from Yvette's and Fitch's phones determined that between 8:00 p.m. and 9:00 p.m. on November 21, 2020, Yvette's cell phone used cell sites covering Wingspread Lane in Albemarle County, while Fitch's cell phone used cell sites covering his residence in Charlottesville. At 8:36 p.m. and 8:39 p.m., Fitch texted Yvette from his residence. Between 9:24 p.m. and 9:33 p.m., Fitch's phone was near Wingspread Lane. Between 9:54 p.m. and 11:00 p.m., Fitch's phone again used cell sites near his home in Charlottesville. The distance between Charlottesville and Wingspread Lane was fifteen miles.

## II. Pre-Trial Motion to Suppress

Before trial, Fitch moved to suppress the evidence obtained from the seizure of his phone. At the hearing on Fitch's motion, Holmes testified that on November 22, 2020, officers developed Fitch as a suspect in Yvette's death and obtained a search warrant for Fitch's residence at 521 Rougemont Avenue in Charlottesville. While officers were preparing to execute the search warrant, Fitch called the Albemarle County Police Department and asked to speak to an officer. Holmes spoke with Fitch on the phone, after which Fitch agreed to voluntarily come to the police station for an interview.

About twenty minutes later, Fitch arrived at the police station. Holmes informed Fitch he was not under arrest and was free to leave. During the interview, Fitch confirmed his cell phone number, that he always carried his phone, and that he had taken his phone with him when he went to the store during the evening on November 21, 2020. At some point, Fitch became agitated and realized that he was a suspect in Yvette's death. Fitch ended the interview.

Holmes informed Fitch that other officers were executing a search warrant at his residence and the warrant authorized the seizure of his phone. Holmes gave Fitch a copy of the search warrant and seized Fitch's phone. Holmes attested that he was concerned that if Fitch was allowed to leave with his phone, he would destroy any evidence that the device contained. The police did not search the contents of Fitch's phone until after they obtained a second search warrant, specific to the phone, on January 25, 2021.

The trial court denied Fitch's motion to suppress. The court found that Holmes obtained a valid search warrant for Fitch's home that allowed for the seizure of Fitch's cell phone. The court reasoned that Fitch's voluntary presence at the police station with his phone did not diminish the probable cause finding that the phone likely contained evidence about Yvette's death. Therefore, the court found the seizure of the phone was reasonable. In the alternative, the trial court found that Holmes seized the phone in good faith and thus the exclusionary rule did not require suppression of the evidence.

At the end of all the evidence, the jury convicted Fitch of the charges and the trial court sentenced him to life plus 8 years of imprisonment with all but 70 years and 8 months suspended. Fitch appeals.

ANALYSIS

I. Motion to Suppress

Fitch argues that the trial court erred when it denied his motion to suppress evidence obtained through the seizure of his cell phone. "[A] defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal." *King v. Commonwealth*, 49 Va. App. 717, 721 (2007). "In reviewing the denial of a motion to suppress based on the alleged violation of an individual's Fourth Amendment rights, we consider the evidence introduced at both the suppression hearing and the trial." *Bagley v. Commonwealth*, 73 Va. App. 1, 12-13 (2021). "Thus, 'we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements.'" *Shiflett v. Commonwealth*, 47 Va. App. 141, 145-46 (2005) (quoting *Jackson v. Commonwealth*, 267 Va. 666, 673 (2004)).

Fitch argues that the seizure of his phone at the police station was outside the scope of the November 22, 2020 search warrant, which only allowed a seizure of his cell phone at his residence. Fitch further argues that neither the exigent circumstances nor the good faith exception to the warrant requirement applies here. He contends that no exigent circumstances justified the seizure of the phone, noting that officers waited two months after the phone's seizure to obtain a search warrant for the phone's contents. Further, he asserts that the good-faith exception to the warrant requirement should not apply because the officers should have obtained a warrant to seize his phone at the police station during his hour-and-twenty-minute interview. Fitch contends that denying his motion to suppress only rewarded Holmes's mistaken belief that the November 22, 2020 warrant authorized the seizure of his phone at the police station.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390 (1985). "Under the Fourth Amendment, officers cannot search a place without a warrant unless one of several delineated exceptions to this warrant requirement apply." *Duncan v. Commonwealth*, 55 Va. App. 175, 179 (2009). Thus "[a] warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999).

When a warrant is obtained, "the scope of a search is limited by the terms of the authorizing warrant." *Rosa v. Commonwealth*, 48 Va. App. 93, 98 (2006). "The Fourth Amendment requires search warrants to 'particularly describ[e] the place to be searched, and the persons or things to be seized.'" *Jeffers v. Commonwealth*, 62 Va. App. 151, 156 (2013) (alteration in original) (quoting U.S. Const. amend. IV).

Here, the November 22, 2020 search warrant authorized the police to search "521 Rougemont Avenue" and seize, among other things, "any mobile communication devices attributed to James Fitch and the electronic contents contained therein, [and] any digital, magnetic or electronic media or devices capable of storing electronic media." But Fitch's phone was not "present" at 521 Rougemont Avenue at any point during the execution of the search warrant. Instead, Fitch's phone was in a police interview room at the police station. The search warrant did not authorize the seizure of Fitch's phone at the police station. Thus, the question we must answer is whether the warrantless seizure of Fitch's phone was reasonable.

Although "[w]arrantless searches and seizures . . . are presumptively unreasonable," the "general rule" has several exceptions. *Bryant v. Commonwealth*, 72 Va. App. 179, 187-88 (2020)

- 8 -

(alterations in original) (quoting *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008)). One such exception allows for a warrantless search based on exigent circumstances. *White v. Commonwealth*, 73 Va. App. 535, 553 (2021). A warrant is not required when "'the exigencies of the situation' make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Id.* (quoting *Ross v. Commonwealth*, 61 Va. App. 752, 759 (2013)).

"'To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, [a c]ourt looks to the totality of circumstances,' examining those 'circumstances as they reasonably appeared to the law enforcement officers on the scene.'" *Id.* at 554 (alteration in original) (first quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013); and then quoting *Verez v. Commonwealth*, 230 Va. 405, 411 (1985)).

When the government has obtained evidence based on a warrantless search, the burden rests with the government to prove both probable cause and exigent circumstances. *Verez*, 230 Va. at 410. As an initial matter, the existence of probable cause is not in doubt. Holmes testified that he obtained a probable cause search warrant for Fitch's home after he interviewed multiple witnesses and acquaintances concerning Yvette's death. The search warrant, among other things, authorized the seizure of Fitch's phone. At issue is only whether the Commonwealth proved exigent circumstances.

"Properly understood, the urgency inquiry is focused on whether there is an emergency situation, such as continuing criminal activity, a person requiring medical care, or the *destruction of evidence*, that likely will worsen if the officers take the time necessary to get a warrant." *White*, 73 Va. App. at 556 (emphasis added). "To the extent it appears that there is no imminent change to the circumstances about to occur and that the status quo largely can be maintained while the officers seek a warrant, the situation is not 'urgent' for the purposes of an exigency analysis." *Id.* at 556-57. Factors relevant to the determination of exigent circumstances include "the degree of urgency

involved and the time required to get a warrant"; "the officers' reasonable belief that contraband is about to be removed or destroyed"; and "information that the possessors of the contraband are aware that the police may be on their trail." *Commonwealth v. Campbell*, 294 Va. 486, 495 (2017) (quoting *Verez*, 230 Va. at 410).

Here, the warrantless seizure of Fitch's phone was reasonable considering the totality of the circumstances. During the interview, Fitch confirmed his cell phone number, that he only had one cell phone, and that he always carried his phone. Thus, it was likely that Fitch had the phone with him when he killed Yvette. Additionally, Fitch referenced a video that was on his phone, which he believed depicted Yvette cheating on him with another man. This video could support a motive for the killing. By the end of the interview, both Fitch and Holmes were aware of the incriminating evidence likely present on Fitch's phone. Then Holmes informed Fitch that a search warrant was being executed at his residence as they spoke. Fitch realized that he was a suspect and asked to leave, concluding the interview. The discovery that he was a suspect led him to become agitated. By the end of the interview, Fitch—possessor of the phone, which contained important incriminating evidence—was "aware that the police may [have been] on [his] trail." *See id.* (quoting *Verez*, 230 Va. at 410).

Given Fitch's agitated behavior, it was reasonable for Holmes to fear that if Fitch left the police station with his phone, he would remove evidence from it or destroy it altogether. He did not have time to get a new warrant allowing him to seize the phone from Fitch at the police station before Fitch left or destroyed the evidence. Considering the totality of the circumstances, the trial court did not err in finding that probable cause and exigent circumstances justified the seizure of Fitch's phone.

II.  Sufficiency of the Evidence

Fitch argues that the evidence is insufficient to support his first-degree murder conviction.  "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Fitch does not dispute that he killed Yvette.  Instead, he argues that he did not do so with premeditation.  Fitch argues that the statements he made to Yvette in anger and the long drive he took to the crime scene could not establish premeditation.  He also argues that the Commonwealth's evidence proved that he was intoxicated at the time of the murder and thus incapable of deliberation.  Thus, he asserts, no reasonable factfinder could conclude that the Commonwealth proved premeditation beyond a reasonable doubt.

Code § 18.2-32 provides that "[m]urder . . . by . . . willful, deliberate, and premeditated killing . . . is murder of the first degree."  "To premeditate means to adopt a specific intent to kill, and that is what distinguishes first[-degree] and second[-]degree murder.  The intent to kill must

- 11 -

come into existence at some time before the killing; it need not exist for any particular length of time." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). "[E]vidence showing that the premeditation was only slight or momentary is sufficient to sustain the conviction. This is so because 'premeditation is an intent to kill that needs to exist only for a moment.'" *Jackson*, 267 Va. at 204 (quoting *Green v. Commonwealth*, 266 Va. 81, 104 (2003)).

In determining whether premeditation existed, "the jury may properly consider the brutality of the attack, . . . whether more than one blow was struck, . . . and the defendant's lack of remorse and efforts to avoid detection." *Avent*, 279 Va. at 208 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)). Circumstances "commonly associated with first-degree murder" include shooting the victim at close range, *Kirby v. Commonwealth*, 50 Va. App. 691, 701 (2007), firing more than a single time, *Chandler v. Commonwealth*, 249 Va. 270, 280 (1995), and the use of "a deadly weapon with little or no provocation," *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994).

"Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). "In determining a defendant's intent, '[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (alteration in original) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)).

Whether Fitch was intoxicated on November 21, 2020, and rendered incapable of premeditation, is a question of fact. By finding Fitch guilty of first-degree murder, the jury

considered but rejected Fitch's hypothesis—that he was too intoxicated to premeditate—and instead concluded that Fitch was capable of deliberation.

Viewing the evidence in the light most favorable to the Commonwealth, there was sufficient evidence for the jury to find that Fitch committed premeditated first-degree murder. Fitch drove 20 minutes to Yvette's employer's home with a fully loaded revolver. He parked halfway up the lane—itself a quarter of a mile long—and approached the house on foot, walking the remaining distance to avoid detection.

Fitch then shot Yvette in the head at close range with a small-caliber revolver. The revolver's cylinder was loaded with four live cartridges, two non-sequential spent casings, and one misfired cartridge between the spent casings. The sequence of the spent and unspent rounds indicated that after Fitch successfully fired the revolver, he pulled the trigger a second time but the revolver misfired. After the misfire, Fitch pulled the trigger a third time, resulting in the revolver properly firing again. Given the time necessary to approach the scene, Fitch's efforts to avoid detection in his approach, the close range, and the repeated shots fired, a reasonable factfinder could conclude beyond a reasonable doubt that Fitch killed Yvette with premeditation. Therefore, we affirm the trial court's decision.

CONCLUSION

Because Holmes could lawfully seize Fitch's phone under the exigent circumstances exception to the warrant requirement, and because the evidence was sufficient to find that Fitch premeditated before killing Yvette, we affirm the trial court's judgment.

*Affirmed.*