# COURT OF APPEALS OF VIRGINIA

Present: Judges Chaney, Frucci and Senior Judge Annunziata
Argued at Fairfax, Virginia

UNPUBLISHED

MIGUEL GUEVARA CONTRERAS

                                    MEMORANDUM OPINION[*] BY

v.      Record No. 0923-23-4            JUDGE STEVEN C. FRUCCI
                                         SEPTEMBER 24, 2024

COMMONWEALTH OF VIRGINIA

### FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Angela L. Horan, Judge

Taylor Sanders (The Irving Law Firm, P.C., on brief), for appellant.

Stephen J. Sovinsky, Assistant Attorney General (Jason S. Miyares, Attorney General; Collin Chayce Crookenden, Assistant Attorney General, on brief), for appellee.

Miguel Guevara Contreras appeals his convictions of three counts of rape.[1] He argues

that the circuit court erred by not suppressing incriminating statements he made to police during

a custodial interrogation. He also challenges the sufficiency of the evidence on the ground that

the victim's testimony was inherently incredible. Finding no error, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Contreras was indicted and pronounced guilty of two counts of rape with offense dates "between April 1, 2021 and December 16, 2021" and one count of rape with an offense date of "on or about December 16, 2021." The conviction order reflects that Contreras was convicted of two counts of rape with an offense date "Between 04/01/2021 and 12/16/2020" and one count of rape with an offense date of "12/16/2020." The sentencing order reflects that Contreras was convicted of three counts of rape with an offense date of "12/16/2020." We remand to the trial court to correct the clerical errors in the conviction and sentencing orders. *See* Code § 8.01-428(B); *Bagley v. Commonwealth*, 73 Va. App. 1, 30 n.10 (2021).

# I. BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Contreras had four children with Jessica Martinez, including T.M.G.[2] Bayron was T.M.G.'s older brother, A.M.G. was T.M.G.'s younger sister, and C.M.G was T.M.G.'s younger brother. Bayron, who was four or five years older than T.M.G., raped her several times when she was nine years old. She told Martinez and Contreras about the abuse. Contreras beat Bayron with a belt and temporarily barred him from the house. Bayron later moved back into the house, but Contreras confined him to his room when he was not at school. Bayron did not abuse T.M.G. again.

Contreras began sexually abusing T.M.G. when she was around 10 or 11 years old. He raped her "[m]ore than five times" and sometimes raped her three times a week when she was in eighth grade. She always told him "no" and "was scared" each time. Contreras used condoms and made T.M.G. take pregnancy tests after raping her.

T.M.G. was afraid to disclose the abuse because Contreras was the family's sole source of income. Despite those concerns, she told Martinez about the abuse two times. Martinez confronted Contreras after the first disclosure, and Contreras denied any wrongdoing. Martinez searched for used condoms and pregnancy tests without success. T.M.G. later told Martinez that

---

[2] We use initials, rather than names, to better protect the privacy of the minor parties mentioned in this opinion.

she had lied about the abuse. At trial, T.M.G. testified that she recanted "because [she] didn't want [Martinez] to feel sad."

The abuse continued, and T.M.G. again reported it to Martinez a few weeks after the first disclosure. That time, Martinez took T.M.G. and A.M.G. to stay at a family member's house in Pennsylvania.[3] After a few days, however, they moved back to Virginia with Contreras because they could not stay with the family member long-term. When Contreras began abusing T.M.G. again after about a month, he told her that the family would split apart if she told anybody else. He would also prohibit her from using electronic devices such as a tablet and told her that if she disclosed the abuse, people would conclude that she was lying out of anger against Contreras for not letting her use those devices. T.M.G. did not tell Martinez about the abuse again because she was afraid that she would be accused of lying and would be blamed for destroying the family. She felt like "it was useless [to] ask[] for help," began to "have thoughts of suicide," and "would cut her wrists and just let [her]self bleed."

T.M.G. testified about three specific incidents that happened when she was in eighth grade. One time, T.M.G. was playing a tablet game in the kitchen when Contreras ordered her to kneel down. He forced her onto her knees when she refused. He then retrieved a condom and "put his penis in [T.M.G.'s] vagina" from behind. He stopped when he heard C.M.G. walking toward the kitchen. On another occasion, T.M.G. was watching television on C.M.G.'s bed in her parents' room when Contreras entered, closed the door, and "started talking to [T.M.G.] in a sexual way." She did not remember much about that incident but remembered that Contreras "put his penis in [her] vagina" while she was lying on her back on the bed.

---

[3] Martinez testified that she took T.M.G. to Pennsylvania after both disclosures and returned to Virginia, each time after T.M.G. told Martinez that she had lied about Contreras raping her.

Finally, on December 16, 2021, T.M.G. was on her phone in the dining room when Contreras entered and asked if he could have sex with her. She told him no, but Contreras grabbed her thigh, pulled down his pants and hers, and "put his penis in [her] vagina." She tried to kick him off, but he held her legs still while "bending forward and backwards." She repeatedly told him to stop, but he did not respond. Contreras eventually stopped and left the room without saying anything more. T.M.G. went upstairs and cried. She may have told A.M.G. about that incident but she could not remember for certain.

T.M.G. told a classmate about the abuse the next day. The classmate told the school counselor, who interviewed T.M.G. T.M.G. told the counselor that Contreras had raped her repeatedly that year.

Detective Dorado interviewed T.M.G. and Martinez at the police station on the afternoon of December 17, 2021. Contreras voluntarily arrived at the station around 8:00 p.m. after learning about T.M.G.'s allegations. Detective Dorado and a Spanish interpreter met Contreras in the police station lobby. Contreras was with C.M.G., who was then five years old. C.M.G. was visibly upset while Detective Dorado led Contreras to an interrogation room. Martinez was in another room with the door closed two doors down from the room where Detective Dorado interrogated Contreras. T.M.G. and A.M.G. were in a room across the hall with the door closed. Detective Dorado did not hear any noises of distress from T.M.G. or A.M.G. To the contrary, he testified that they were playing games, drawing pictures, and "happy to be with each other." T.M.G. and Martinez went to the hospital shortly before 10:00 p.m.

The recording of the interrogation begins around 10:00 p.m. and shows Contreras sitting in an empty interrogation room without handcuffs. Some muffled sounds can be heard in another room at the start of the video. Detective Dorado and the interpreter entered the room

- 4 -

after about 40 minutes. Detective Dorado read Contreras his *Miranda*[4] rights while the interpreter translated. He then asked Contreras whether he was willing to talk about "anything we need to talk about." Contreras responded, "100%."

Contreras knew that his daughter had accused him of "something" but insisted that he was innocent. He understood that he had the right to hire a lawyer and asked if Detective Dorado recommended that he do so, while maintaining that he did "not have a problem" answering Detective Dorado's questions. Detective Dorado responded that he could not give Contreras advice about whether to hire a lawyer.

About 15 minutes into the interrogation, Contreras explained that Bayron had sexually assaulted T.M.G. and that Contreras had punished him by hitting him with a belt. In contrast to his forthrightness about Bayron, Contreras maintained his own innocence and denied being alone with T.M.G. in the dining room on December 16, 2021. Detective Dorado asserted that Contreras was lying but told him, "I don't want you to say you did something you didn't do." They took an hour-long break starting around 12:30 a.m.

When they returned, Contreras asked about Martinez because a neighbor had told him that she was in handcuffs. Detective Dorado responded that she had been handcuffed as a safety precaution but was not under arrest, was no longer at the police station, and was "okay."

Around 2:00 a.m., Contreras admitted that he had abused T.M.G. He admitted that he had raped her on December 16 for around 30 seconds but stopped because he was afraid of getting caught. He told Detective Dorado that he had never planned to rape her but did so because the opportunity "was there" like when "you have a gun and just pull the trigger" without thinking. He also felt that the harm of raping T.M.G. was mitigated because T.M.G. "was already damaged by Bayron." He would give her a tablet or phone to play with while he was

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

raping her because "when she [wa]s not playing" she would begin to think that "what happened was not correct." He stated that he used condoms and purchased pregnancy tests for T.M.G. to use. At the end of the interrogation, Contreras wrote apology letters to Martinez and T.M.G.

Contreras moved to suppress his statements to Detective Dorado, arguing that he had involuntarily waived his *Miranda* rights "because of the distressed voices of family members [in] the adjoining room." Contreras did not testify at the suppression hearing, but his counsel contended that Contreras was "under the belief that everybody [in his family was] getting arrested" and felt like he had "to say something that would let his family go." Counsel conceded that the police never told Contreras that his family was under arrest. He nonetheless argued that his family's presence and the length of the interrogation broke his will and rendered his *Miranda* waiver involuntary. The circuit court denied the motion after finding that there was no coercive conduct by the police and that Contreras understood his rights.

At trial, Contreras denied raping T.M.G. He speculated that she fabricated her allegations because she was angry with him for taking away her tablet access. But he also testified that it was "almost always" Martinez who took T.M.G.'s tablet away. Ultimately, the jury convicted Contreras of three counts of rape, and the circuit court sentenced him to 120 years' imprisonment with 70 years suspended.

## II. ANALYSIS

A. *The circuit court did not err when it denied Contreras's motion to suppress his confession.*

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, the Commonwealth may not "us[e] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Keepers v.*

*Commonwealth*, 72 Va. App. 17, 34 (2020) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  As such, police officers are required to provide a *Miranda* warning informing suspects in their custody of certain rights prior to custodial interrogations, including the right to an attorney and the right to remain silent.  *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) (citing *Miranda*, 384 U.S. at 479).  The Commonwealth bears the burden of proving that the suspect waived his right to remain silent "knowingly, intelligently, and voluntarily."  *Knox v. Commonwealth*, 52 Va. App. 366, 372 (2008) (quoting *Green v. Commonwealth*, 27 Va. App. 646, 652 (1998)).

In the case at hand, Contreras challenges only the voluntariness of his *Miranda* waiver. "[V]oluntariness is a question of law, subject to independent appellate review."  *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)).  "Subsidiary factual questions, however, are entitled to a presumption of correctness."  *Id.* "When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial."  *Tirado v. Commonwealth*, 296 Va. 15, 24 (2018) (quoting *Commonwealth v. White*, 293 Va. 411, 414 (2017)).

A *Miranda* waiver is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" and involuntary if "the maker's will has been overborne and his capacity for self-determination critically impaired."  *Id.* at 28 (quoting *Gray v. Commonwealth*, 233 Va. 313, 324 (1987)).  "If the suspect's will has been overborne and his capacity for self-determination critically impaired, the confession is considered involuntary and its use is unconstitutional."  *Avent*, 279 Va. at 195 (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995)).  We assess voluntariness by examining "the totality of the circumstances," including "the defendant's age, intelligence, mental and physical condition, background and experience with the

- 7 -

criminal justice system, the conduct of the police, and the circumstances of the interview." *Thomas*, 72 Va. App. at 582 (quoting *Keepers*, 72 Va. App. at 37). Manifestly, the maker's choice is not free and unconstrained if it stems from "intimidation, coercion, or deception" by the police. *Tirado*, 296 Va. at 28 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

Contreras claims that five circumstances overbore his will and rendered his *Miranda* waiver involuntary. None is persuasive even in combination. First, Contreras emphasizes that Detective Dorado told him that he was not free to leave. But *Miranda* applies only when a defendant is in custody, and a defendant is in custody when "there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Keepers*, 72 Va. App. at 34 (quoting *Spinner v. Commonwealth*, 297 Va. 384, 392 (2019)). It follows that cases dealing with the voluntariness of a *Miranda* waiver will necessarily involve defendants who are not free to leave. Accordingly, that circumstance cannot render Contreras's *Miranda* waiver involuntary, lest we cast doubt whether *Miranda* warnings can *ever* cure the compelling circumstances inherent in a custodial interrogation.

The next three circumstances pertain to Contreras's professed desire to protect his family. But those circumstances did not arise from coercive police conduct. "[E]vidence of coercive police activity 'is a necessary predicate to the finding that a [*Miranda* waiver] is not "voluntary."'" *Washington v. Commonwealth*, 43 Va. App. 291, 303 (2004) (first alteration in original) (quoting *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992)). "The sole concern of the Fifth Amendment . . . is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

Even if we believed that Contreras confessed so that his family could go home, that confession would stem from "psychological pressures . . . emanating from sources other than official coercion." *Id.* There is no evidence that the police manipulated the situation so that Contreras would hear the anguished voices of his family members. In fact, the evidence read in the light most favorable to the Commonwealth, shows quite the opposite. T.M.G. and Martinez already had left the police station to go to the hospital before the interrogation. Furthermore, by the time Contreras admitted to raping T.M.G., Detective Dorado had explained that Martinez was not under arrest, had left the police station, and was "okay." As nothing about that answer was improper or would coerce Contreras to confess to protect Martinez, the record does not support Contreras's contention that he "believe[d] . . . he ha[d] to say something that would let his family go."

Finally, the length of the interrogation does not render Contreras's *Miranda* waiver involuntary. We have consistently held that a lengthy interrogation alone does not overbear a suspect's will. *See, e.g.*, *Jackson v. Commonwealth*, 255 Va. 625, 637 (1998) (finding that an interrogation lasting 4 hours and 38 minutes did not overbear suspect's will); *Midkiff*, 250 Va. at 269 (stating "while the interrogation process lasted well into the early morning hours . . . th[is] factor[ is] not sufficient to establish that [the defendant's] will was overborne"). The same result obtains here, bolstered by the fact that the police provided Contreras a long break during the interrogation.[5] Moreover, Contreras challenges the voluntariness of his *Miranda* waiver, not the voluntariness of his statements more generally. Contreras provided that waiver at the beginning of the interrogation, saying that he would answer Detective Dorado's questions "100%" and did "not have a problem" answering those questions. Those statements establish that Contreras voluntarily waived his right to remain silent.

---

[5] Of course, using a translator will necessarily prolong any interrogation because questions and answers must be repeated.

"All police interviews of suspects have coercive aspects to them by virtue of the fact that the interrogating officer is part of a system which may ultimately charge the suspect with a crime." *Midkiff*, 250 Va. at 269. Contreras has not demonstrated that the police engaged in coercive conduct beyond that inherent in custodial interrogations. Accordingly, the circuit court correctly denied Contreras's suppression motion.

B. *A reasonable finder of fact could conclude beyond a reasonable doubt that Contreras was guilty of the charged offenses.*

Contreras also challenges the denial of his motion to strike the Commonwealth's evidence and the sufficiency of the evidence to support his convictions. In regard to both issues, he contends that T.M.G.'s testimony was incredible.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)). "In the end, the appellate court 'ask[s] whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" *Eberhardt v. Commonwealth*, 74 Va. App. 23, 31 (2021) (alteration in original) (quoting *Davis v. Commonwealth*, 65 Va. App. 485, 500 (2015)).

In addition, "[t]he fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and

the inferences to be drawn from proven facts." *Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019) (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010)). This Court gives "deference to the fact finder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009). As such, this Court "may only . . . disturb[]" its conclusion "on appeal if this Court finds that [the witness'] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (third alteration in original) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). Thus, "there can be no relief" in this Court if a witness testifies to facts "which, if true, are sufficient" to support the conviction "[i]f the trier of the facts" bases its decision "upon that testimony." *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010) (quoting Swanson *v. Commonwealth*, 8 Va. App. 376, 379 (1989)).

Contreras does not argue that T.M.G.'s testimony, if believed, failed to establish the elements of rape. He argues only that her testimony was inherently incredible because she "ha[d] a history of recanting similar allegations" and was motivated to lie because of her anger at Contreras for limiting her tablet usage and not protecting her from Bayron. Established precedents foreclose his arguments. Testimony "may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (citing *Juniper*, 271 Va. at 415). Similarly, a "motivation to lie" does not render a witness's testimony unworthy of belief. *Id.* at 625, 627. Instead, those circumstances are appropriately submitted to and resolved by the fact finder. *Id.*

- 11 -

Here, T.M.G.'s alleged motive to lie applied equally, if not with greater force, to Martinez who, by Contreras's own testimony, "almost always" took away T.M.G.'s tablet and failed to protect her from Bayron. Yet, not only did T.M.G. not make any similar allegations against Martinez, but she also testified that she loved and missed Martinez and was upset that they no longer lived together. The jury also heard about T.M.G.'s prior recantations and her reasoning behind them, as well as T.M.G.'s testimony that Contreras told her that, if she ever disclosed his abuse, he would claim that she lied because she was angry about him taking her tablet. "[E]vidence with some element of untrustworthiness is customary grist for the jury mill." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). It was the province of the jury, not this Court on appeal, to consider all that evidence and determine which witness was more credible.

T.M.G.'s testimony was not inherently incredible. It is well-settled that in rape and sexual assault cases, the sole testimony of the victim, if not inherently incredible, is sufficient to sustain a conviction. *See Fisher v. Commonwealth*, 228 Va. 296, 299 (1984); *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). There is no requirement of a corroborating eyewitness because, as the Supreme Court of Virginia has aptly stated, a "requirement of corroboration would cause most sex offenses to go unpunished," given the clandestine nature of such crimes. *Fisher*, 228 Va. at 299. Accordingly, a reasonable finder of fact could conclude beyond a reasonable doubt that Contreras was guilty of the charged offenses.

III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment and remand to correct the clerical errors in the conviction and sentencing orders.

*Affirmed and remanded.*