# COURT OF APPEALS OF VIRGINIA

**Record No. 0364-25-4**

LOGAN ANTIGONE, ET AL.

v.

JAY C. TAUSTIN

**Record No. 0393-25-4**

JAY C. TAUSTIN

v.

LOGAN ANTIGONE, ET AL.

Present: Judges Lorish, Callins and White

Argued at Alexandria, Virginia

Opinion Issued June 16, 2026

## FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

William H. Hurd (Eckert Seamans Cherin & Mellott, LLC, on briefs), for Logan Antigone, Taryn Antigone More, and Susan F. Antigone.

John P. O'Herron (Catherine Chapman; Peter S. Askin; Timothy A. Richard; Bethany B. Johnson; ThompsonMcMullan, P.C.; Bethune Benes, PLLC, on briefs), for Jay C. Taustin.

## PUBLISHED OPINION BY
## JUDGE LISA M. LORISH

This litigation is but the latest between two families who disagreed on how to manage

business entities that owned a valuable piece of real estate (the "Property"). After Jay C. Taustin

successfully ousted his brother-in-law, Chris Antigone, as manager and voting member of Dulles

Gateway Associates, LLC ("DGA") and TAB I Associates, LLC ("TAB I") (together, the

"Companies"), Taustin obtained indemnification of $4.5 million in legal fees associated with this

ouster. Taustin then sold the Companies' only asset, the Property, and used part of those proceeds

for the indemnification.  Taustin argues this was authorized under the Companies' organizing documents.  Susan Antigone (Taustin's sister) and Logan and Taryn Antigone (the children of Susan and Chris) (together, the "Antigones") argue in their derivative suit that Taustin breached his fiduciary duties by indemnifying himself (Count I) and by selling the Property for less than its fair market value (Count II).  A jury found for Taustin on both counts, but the trial judge set aside the jury verdict on Count I and granted judgment for the Antigones on that count.

The Antigones now appeal.  They argue that numerous errors entitle them to a new trial on Count II and that the court should have awarded them more pretrial interest on the damages award for Count I.  They also argue that the trial court erred before the trial when it sustained Taustin's demurrer on another breach of fiduciary duty claim based on actions that Taustin took, which led to Chris forfeiting his economic interest in DGA (Count III).  For his part, Taustin argues that Count I never should have reached the jury because the trial court should have found his indemnification was appropriate under the Companies' organizing documents and granted his motion for summary judgment.  We agree that the Companies' organizing documents authorized Taustin's indemnification and that Count I should not have gone to the jury.  We also find that none of the errors alleged by the Antigones pertaining to Count II require reversal.  But we agree with the Antigones that they pleaded a valid claim for breach of fiduciary duty in Count III and that the trial court erred in sustaining Taustin's demurrer on the same.  Thus, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

A. Prologue to the Derivative Action

These appeals are the latest chapter in a long and litigious family business dispute.[1] Chris and Taustin were voting members of DGA and TAB I. The Property—the Companies' only asset—consisted of roughly 280 acres of land in Loudoun County. Chris served as the manager of both companies. In 2011, Taustin sued Chris for breach of fiduciary duty, seeking to disassociate him as a member of the Companies. Chris later filed a counterclaim, seeking to disassociate Taustin and several others. This litigation is referred to as the "Consolidated Cases."

Around the same time, Taustin initiated arbitration against Chris with the goal of removing Chris as manager. Despite finding that Chris "had materially breached the operating agreements" by spending money and incurring debt without consulting Taustin, the arbitrator concluded that his actions "did not constitute bad faith" and that they "may have put the [P]roperty in a better position for a future sale." The arbitrator also declined to remove Chris as manager.

The Consolidated Cases proceeded to trial in late 2015. The trial court found, among other things, that Chris "willfully and persistently committed material breaches" of the Companies' operating agreements, that he "improperly sought to purchase the Taustin's interest in the [C]ompanies that would have resulted in the loss of millions of dollars in value for the Taustin's," and that Chris "r[a]n the Companies as if they belonged solely to him." The court then entered an order dissociating Chris, stripping him of "his governance rights," but not of "his

---

[1] The trial court took judicial notice of the events underlying this litigation and provided a summary to the jury. That summary is substantially reproduced in this subsection.

economic/ownership interest in the [C]ompanies." Taustin then became the sole voting member and manager of the Companies.

In 2016, Taustin sued the Companies, Chris, Susan, Logan, and Taryn, "seeking indemnification for more than $4,500,000 in legal fees he incurred" during the Consolidated Cases and arbitration. The suit was never served on any of the defendants. Instead, Taustin entered a "release and settlement agreement" "on his own behalf and on behalf of the [C]ompanies as sole voting member," and the suit was dismissed as settled. Taustin, along with several of his family members who, together, held the majority of the voting shares in the Companies, also executed written consents approving of the indemnification.

Then in 2017, Taustin invoked Section 10.1 of the DGA Operating Agreement. Taustin claimed that, because of Chris's dissociation, Section 10.1 authorized DGA to redeem Chris's "entire ownership interest in DGA for an amount equal to half of his capital account." The "redemption would have resulted in the loss of millions of dollars in value for" Chris. So Chris sued, beginning the "Section 10.1 Case." After a trial, the court found that "the DGA operating agreement did not allow for the redemption of [Chris's] economic interest pursuant to Section 10.1" and entered an order "declaring that [Chris] retain[ed]" his interest in DGA.

B. The Derivative Action and Pretrial Rulings

The Antigones[2] filed a derivative action against Taustin in 2019 with three claims for breach of fiduciary duty.

- *Count I* alleged that Taustin breached his fiduciary duty by "improperly obtaining indemnification" for the $4.5 million in legal fees for the Consolidated Cases.[3] The Antigones further

---

[2] The Antigones individually hold relatively minor interests in the Companies. Including the shares owned by Chris (who was not a plaintiff in this litigation), however, members of the Antigone family collectively own more than half the interest in the Companies.

[3] In Count IV, the Antigones alternatively claimed that Taustin violated the Companies' governing documents in obtaining the indemnification.

alleged that Taustin had "his family members," who are also members of the Companies, voted to "secretly rubber stamp his request for indemnification."

- *Count II* claimed that Taustin breached his fiduciary duty by later selling the Property at a price far lower than its value in pursuit of his own interests and "to the exclusion of consideration of the best interests of the Companies."
- *Count III* alleged that Taustin breached his fiduciary duty by causing DGA to incur attorney fees in the Section 10.1 Case because that action was motivated by Taustin's "personal animus against [Chris]."

Taustin demurred. The trial court overruled the demurrer to Counts I and II but sustained it as to Count III. In its order, the court noted that Taustin's actions in the Section 10.1 Case "were not frivolous" and that a prevailing party "has not alleged sufficient facts to show that the non-prevailing party breached a fiduciary duty or engaged in bad faith simply because the non-prevailing party did not succeed in the claims asserted." In a later opinion, the court added that this litigation was unlikely to continue if Taustin prevailed in the Section 10.1 Case and that Count III would not survive future motions.

Both the Antigones and Taustin sought summary judgment on Count I, but the trial court denied their motions. Among other things, Taustin argued in his motion that he did not engage in "willful misconduct" in obtaining indemnification, that he was entitled to indemnification under the Companies' Articles of Organization (the "Articles"), that his liability, if any, was limited, and that his decision was a matter of business judgment.

C. The Derivative Action Trial

The parties proceeded to trial on Counts I and II. Relevant to the issues raised on appeal, Taustin called law professor James Wheaton as an expert in "the field of LLC manager conduct" "in the context of selling a major or principal asset of the company." The Antigones objected to Wheaton's testimony before and at trial. The parties then agreed at trial to take Wheaton's

testimony outside the presence of the jury and to read the admissible portions to the jury later. However, Taustin ultimately decided not to read Wheaton's testimony to the jury.

Following the presentation of the evidence at the multiday trial, the trial court instructed the jury. Several of the instructions were disputed. Over objections from the Antigones, the trial court read Instruction C-8, which stated that "[u]nder the business judgment rule, a manager is presumed to have acted properly and in good faith in the exercise of his business judgment." The trial court also rejected the Antigones' Proposed Instruction 3, which included the statement that "[a]n act which is otherwise legal or within the authority of the manager may, nevertheless, breach the manager's fiduciary duty."

The jury found in favor of Taustin on both Count I and Count II.

D. After the Derivative Action Trial

The Antigones filed several motions after the verdict. The trial court reconsidered its denial of the Antigones' initial motion for summary judgment on Count I, set aside the jury verdict on that count, and entered judgment for the Antigones for approximately $4.5 million. The trial court found, among other things, that "the limitation of liability for 'damages' caused to the LLCs does not include restitution for payments wrongfully taken from the LLCs." The court also found that Taustin engaged in willful misconduct by approving his own indemnification, reasoning that "willfulness" does not require a specific intent to harm and citing several Delaware cases that liken a "requirement to refrain from 'willful misconduct' to the traditional fiduciary duty of loyalty." The court nevertheless declined to award prejudgment interest, citing the long delay in resolving the case. After the Antigones moved the court to reconsider this ruling, the trial court declined to grant prejudgment interest from the date suggested by the Antigones but awarded interest from the date of its initial denial of the summary judgment motion.

As to other issues raised after trial, the court denied the Antigones' motion to set aside the verdict and order a new trial on Count II. The trial court ultimately awarded the Antigones "a carve out of $1.3 million" in fees. Both sides now appeal.

ANALYSIS

We start with Count I, the breach of fiduciary duty claim based on Taustin's obtaining indemnification for litigation costs. Taustin sets forth six assignments of error relating to the trial court's decision to set aside the jury's finding that he did not breach his fiduciary duty, and to conclude as a matter of law that he breached his fiduciary duty, which led to imposition of a final judgment for the Antigones. Because we agree that the circuit court erred by not granting summary judgment in Taustin's favor on this count, we need not address the other purported related errors. We then take up the Antigones' alleged errors pertaining to Count II, which assert that Taustin breached his fiduciary duty by selling the Property, and find no reversible error. Finally, we consider and disagree with the trial court's holding, at the demurrer stage, that Count III inadequately pleaded that Taustin breached his fiduciary duties through his actions associated with the Section 10.1 Case.

I. The trial court erred by not granting summary judgment for Taustin on the breach of fiduciary duty through indemnification claim (Count I).

"In an appeal from a circuit court's decision to grant or deny summary judgment this Court reviews the application of law to undisputed facts de novo." *Va. Fuel Corp. v. Lambert Coal Co.*, 291 Va. 89, 97 (2016) (quoting *Deutsche Bank Nat'l Tr. Co. v. Arrington*, 290 Va. 109, 114 (2015)). "Further, this Court reviews the circuit court's interpretation of an agreement de novo." *Id*. at 97-98.

This claim comes down to interpreting the Companies' Articles, which are ultimately contracts. *See Gottlieb v. Econ. Stores, Inc.*, 199 Va. 848, 856 (1958) ("The constitution and by-laws adopted by a voluntary association constitutes a contract between the members, which, if

not immoral or contrary to public policy, or the law, will be enforced by the courts." (quoting

*Bradley v. Wilson*, 138 Va. 605, 612 (1924))). An appellate court "construes a contract 'as

written, without adding terms that were not included by the parties.'" *Ehrhardt v.*

*SustainedMED, LLC*, 300 Va. 334, 340 (2021) (quoting *City of Chesapeake v. Dominion*

*SecurityPlus Self Storage*, 291 Va. 327, 335 (2016)). "The fundamental question . . . is 'what did

the parties agree to as evidenced by their contract, and the guiding light for such construction is

the intention of the parties as expressed by them in the words they have used.'" *Id.* at 340-41

(quoting *RECP IV WG Land Invs. LLC v. Cap. One Bank (USA), N.A.*, 295 Va. 268, 283 (2018)).

"When a contract is clear and unambiguous, the '[w]ords that the parties used in a contract are

normally given their usual, ordinary, and popular meaning.'" *Id.* at 341 (alteration in original)

(quoting *RECP*, 295 Va. at 283).

The parties agreed that the Articles for both Companies are "nearly identical" for all

purposes relevant to this litigation. The Articles for TAB I state:

> The Company shall indemnify an individual who is, was or is
> threatened to be made a party to any threatened, pending or
> completed action, suit or proceeding, whether civil, criminal,
> administrative or investigative, including all appeals, by reason of
> the fact that he or she is or was a member, manager or officer of
> the Company, against any and all expenses (including reasonable
> attorneys' fees), judgments, decrees, fines, penalties and amounts
> paid in settlement, which were actually and reasonably incurred by
> him or her in connection with such action, suit or proceeding, if he
> or she acted in good faith and in a manner which he or she
> reasonably believed to be in, or at least not opposed to, the best
> interests of the Company[.][4]

---

[4] The Articles for DGA except from indemnification any liabilities and expenses incurred because of the individual's "willful misconduct or knowing violation of the criminal law." While this language could theoretically introduce the concept of "willful misconduct" to the question of whether Taustin was a person entitled to indemnification under the Articles, below and on appeal, both parties agreed that the only relevant language of the Articles was the language "is, was or is threatened to be made a party to any . . . proceeding . . . by reason of the fact that he or she is or was a member, manager, or other officer of the Company." This only makes sense, as

In addition to stating the rule for when indemnification should occur, the Articles state the process for the "[d]etermination of [i]ndemnification":

> The Company shall not indemnify a member, manager, or other officer under Section A unless authorized in the specific case after a determination has been made that indemnification of the member, manager, or other officer is permissible in the circumstances because he has met the standard of conduct set forth [above]. That determination shall be made:
>
> > (i)  by the members by a majority vote of a quorum consisting of members not at the time parties to the proceeding;
> >
> > (ii)  if such a quorum cannot be obtained, by majority vote of a committee duly designated by the members (in which members who are parties may participate in such designation), consisting solely of two or more members not at the time parties to the proceeding; or
> >
> > (iii)  by special legal counsel:
> >
> > > a. selected by the members or its committee in the manner prescribed in subsection (i) or (ii) above; or
> > >
> > > b. if such a quorum of the members cannot be obtained and such a committee cannot be designated, selected by a majority vote of the members, in which members who are parties may participate in such selection.

We find that Taustin was eligible for indemnification under the plain text of the Articles and that the process he used to receive indemnification was authorized by the same.

A. The indemnification clause does not prohibit recovery for a party who initiates litigation.

Taustin sought summary judgment on Count I, arguing that his seeking indemnification for the costs of litigation could not have breached his fiduciary duties when indemnification was expressly authorized by the Articles. This question turns on how to interpret the phrase "made a

---

the alleged misconduct relevant to Count I was Taustin's obtaining indemnification, not his incurring expenses by initiating the Consolidated Cases in the first place.

party" when the Articles offer indemnification for "an individual who is, was or is threatened to be *made a party* to any threatened, pending or completed action, suit or proceeding." (Emphasis added).

As Taustin reads the provision, "party" is the common object. In other words, the Companies should indemnify an individual (1) who is a *party* to any threatened, pending, or completed action; (2) who was a *party* to any threatened, pending, or completed action; and (3) who is threatened to be made a *party* to any threatened, pending or completed action. The circuit court, on the other hand, agreed with the Antigones that the phrase "made a party" modified each of the preceding categories of listed individuals so as to preclude from eligibility someone who instigated litigation. Under this interpretation, the Companies should indemnify an individual (1) who is *made a party* to any threatened, pending, or completed action; (2) who was *made a party* to any threatened, pending, or completed action; or (3) who is threatened to be *made a party* to any threatened, pending, or completed action. The result of this reading is that the only parties eligible for indemnification are those who were "made a party"–i.e., joined the litigation in a defensive posture.

The parties each wield an opposing canon of statutory construction[5] and urge us to apply their preferred canon to reach their preferred result. The Antigones point to the series-qualifier canon, which provides that "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012). Taustin relies on the rule of the last antecedent, which states that "[w]hen the syntax

---

[5] It has often been observed that every canon can be countered by an "equal and opposite" canon. *See* Richard A. Posner, *Statutory Interpretation—In the Classroom and in the Courtroom*, 50 U. Chi. L. Rev. 800, 805 (1983); Karl N. Llewellyn, *The Common Law Tradition: Deciding Appeals* 521-35 (Little, Brown, 1960).

involves something other than [such] a parallel series of nouns or verbs," the modifier "normally applies only to the nearest reasonable referent." *Id.* at 152. The rule of the last antecedent "is the 'preferred procedure for clarifying whether modifying language is intended to modify all preceding antecedents or only the final one.'" *Coffman v. Commonwealth*, 67 Va. App. 163, 168 (2017) (quoting *Newberry Station Homeowners Ass'n v. Bd. of Supervisors of Fairfax Cnty.*, 285 Va. 604, 615 n.4 (2013)).

Canons are tools of linguistics that can sometimes help us understand the intention behind a contract. But we also consider context, logic, and common sense.[6] In doing so, it is clear that the overall construction of the sentence at issue sets out broad indemnification eligibility for different "parties" and not different categories of people "made" parties.

The indemnification provision ensures that "an individual" who "is or was a member, manager or officer of the Compan[ies]" will be protected against litigation expenses, incurred because of their position with the Companies, related to "any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including all appeals." Our Supreme Court has repeatedly explained that "unrestrictive modifiers" like "any"

---

[6] Indeed, we have done so in many other cases. *See, e.g.*, *Scott v. McDougle*, ___ Va. ___, ___ (May 8, 2026) (emphasizing the importance of context, which "includes common sense," in textual interpretation (quoting *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring))); *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 34 (2019) (choosing the "more common-sense interpretation" of an insurance policy); *RECP*, 295 Va. at 289 ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." (quoting *Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 293 Va. 190, 200 (2017))); *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 281 (2016) (noting that the "interpretation does not offend logic or render the statute inoperable"); *Smoot v. Commonwealth*, 37 Va. App. 495, 501 (2002) (discussing "the structure of the challenged sentence in the order, and the grammatical rules that pertain"); *Va. Educ. Ass'n v. Davison*, 294 Va. 109, 121 (2017) (applying "rules of grammar"); *Commonwealth, Dep't of Highways & Transp. v. E.W. Yeatts, Inc.*, 233 Va. 17, 24 (1987) (looking to the "context" and "common sense"); *Grafmuller v. Commonwealth*, 57 Va. App. 58, 67 (2010) (relying on the principles of statutory interpretation and a "common sense interpretation"); *Bunn v. Commonwealth*, 21 Va. App. 593, 598 (1996) (considering the language and "logic of the statute").

and "an" are "generally considered to apply without limitation."  *Sussex Cmty. Servs. Ass'n v. Va. Soc'y for Mentally Retarded Child.*, 251 Va. 240, 243 (1996).  The word "any" is "defined, in part, as 'one or some *indiscriminately of whatever kind*'" and "one that is selected *without restriction or limitation of choice*."  *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018) (quoting *Any*, *Webster's Third New International Dictionary* (2002)).  The only limitation in the provision is the requirement that the individual has "acted in good faith and in a manner which he or she reasonably believed to be in, or at least not opposed to, the best interests of the Compan[ies]."  The broad inclusion of "an" individual and "any" litigation combined with a single express limitation—that the person acted in good faith, and in the best interest of the Companies—counsels against interpreting the provision to apply only to defensive litigation.[7]

This is also the most natural reading of the clause: "[t]he Compan[ies] shall indemnify an individual who is, was or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding."  For one, the entire phrase "to be made a party" only reasonably relates to "is threatened," not the other verbs in the series.  Additionally, if the parties intended to cover only defensive litigation, conveying that intent through the phrases "is made a party, was made a party, or is threatened to be made a party" would not be a clear way to accomplish that goal.  After all, the phrase "made a party" does not necessarily include only circumstances where someone was sued.  Someone is "made a party" when they are sued but they also might be said to be "made a party" if the actions of another gave them no option but to sue.  If the manager of a company is harming the company, and a member sues for his removal, the member is arguably "made a party" by the manager's action and limited available remedies.

---

[7] While the DGA indemnification provision does not include all of this same language, nothing therein suggests that it applies only to defensive litigation either.

Furthermore, the interpretation adopted by the trial court would run into many practical difficulties. In many cases, like this one, there are claims and counter-claims. But who was "made a party" in such a case? Only the original defendant? There may be other circumstances where someone was added as a plaintiff because they were a necessary party to a pending suit, and not because they originally elected to sue.

We do understand, however, the trial court's concern about interpreting an indemnification provision to cover "the fight over the control and management of the LLC." But at the same time, the trial court's interpretation gives rise to a countervailing concern that a wayward manager would be effectively insulated from accountability because anyone bringing a suit to stop him from harming the Companies would have to personally eat all the costs of doing so.[8] Regardless of whether it is generally a good idea for an LLC to reimburse members fighting with each other over the management of the company, the right question is what the Articles' text requires.

Context, language, and common sense support Taustin's reading of the provision. Taustin was a party to the Consolidated Cases (both as plaintiff and counter-defendant). Interpreting the Articles as written, Taustin was entitled to indemnification—subject to other safeguards and provisions. Namely, a majority of members must agree that the expenses and fees were reasonably incurred and that the party "acted in good faith and in a manner which he or she reasonably believed to be in, or at least not opposed to, the best interests of the Compan[ies]." A

---

[8] We also note that in Delaware, a state no stranger to corporate litigation, the Supreme Court of Delaware has interpreted the state's indemnification statute to permit indemnification of expenses incurred by corporate directors who had initiated a lawsuit in their own names, against other directors, where that suit was brought "at least in part, to fulfill their own fiduciary obligations to the corporation." *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 342-43 (Del. 1983); *see also Shearin* v. *E.F. Hutton Grp., Inc.*, 652 A.2d 578, 594 (Del. Ch. 1994) (concluding that permissible claims for indemnification "will include those deriving from lawsuits brought by directors, officers, agents, etc., *only insofar as the suit was brought as part of [the indemnitee's] duties to the corporation and its shareholders*").

company can elect a different course, but the Articles here are broad and cover both offensive and defensive litigation.

B. The process Taustin used to obtain indemnification complied with the Articles.

The Antigones also argue that, to the extent Taustin was eligible for indemnification, he failed to comply with the proper process for indemnification under the Articles. The Articles created several avenues for approving indemnification, including approval "by the members by a majority vote of a quorum consisting of members not at the time parties to the proceeding." The parties disagree over whether "at the time parties to the proceeding" refers to the time of the proceeding, or the time the vote on indemnification takes place.

The Antigones rely on what they find to be the overall purpose of the provision— protecting against payments where there is a conflict of interest. Thus, they argue that it only makes sense that a majority of members not involved in the litigation should have to approve the indemnification. Taustin relies on the unambiguous text, and under our well-established caselaw, we agree that the text wins.

We start by putting the phrase "at the time" within the full context of the provision in question. *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179 (2016) ("In addition, 'when considering the meaning of any part of a contract, we will construe the contract as a whole.'" (quoting *Drs. Co. v. Women's Healthcare Assocs.*, 285 Va. 566, 572-73 (2013))). As noted above, the indemnification determination section of the Articles provides three options for approval. First, by a majority vote of a quorum of members "not at the time parties to the proceeding." Second, if a quorum cannot be obtained, "by majority vote of a committee duly designated by the members (in which members who are parties may participate in such designation), consisting solely of two or more members not at the time parties to the proceeding." Finally, "by special legal counsel" selected by the members or the committee "in the manner prescribed" by the

- 14 -

earlier two options.  Or, "if such a quorum of the members cannot be obtained and such a committee cannot be designated, selected by a majority vote of the members, in which members who are parties may participate in such selection."

Each of the three options is set within the "determination of indemnification" paragraph and relates to how "the determination shall be made."  Thus, the phrase "[a]t the time parties to the litigation" most naturally refers to when the "determination shall be made."  This reading is also supported by the rest of the provision.  Section (ii) allows "members who are parties" to vote on establishing a committee that could include "members not at the time parties to the proceeding."  The only way to make sense of this provision is if "members who are parties" refers to the point at which the determination of indemnification is being made.

The Antigones do not dispute that the proceedings had concluded by the time of the vote on indemnification.  Nor do they contest that if the full "Taustin faction" could vote, Taustin had a sufficient majority to be indemnified.[9]  Thus, by receiving a favorable vote from a majority of eligible members, Taustin properly obtained indemnification under one of the pathways outlined in the Articles.

    C.  The court should have granted summary judgment for Taustin because the parties agreed that there were no material facts in dispute related to Count I.

Taking into consideration the proper understanding of the Articles' indemnification provisions, the trial court erred by denying Taustin's motion for summary judgment.  The Articles allow for indemnification when an individual is or was a party to a proceeding.  The

---

[9] After Chris was ousted from the Companies, Taustin amended the Articles to mirror Code § 13.1-1022(E) and state that if an "action requires the vote or approval of other Members of the Companies, those Members may take formal Company action without a meeting, without prior notice, and without a formal vote," through a signed written consent.  The voting power was tied to the "number of Class A and/or B Units held by such Member" and "a disassociated Member shall have no voting power."  The number of signatures required on the written consent had to equal "the minimum number of votes that would otherwise be necessary to authorize or take such action at a meeting."  The Antigones have not challenged this action by Taustin.

Antigones do not dispute that Taustin was a party in the underlying litigation. And the Articles explicitly permit approval of indemnification by a majority of members not at that time parties to the proceeding. The Antigones again do not dispute that the proceeding had concluded and that Taustin obtained such a vote from eligible members. Taustin was thus entitled to summary judgment. Finding that the trial court so erred, the other errors Taustin alleges in Count I are moot, as they depend on us ruling against Taustin on this point. Also moot is the Antigones' claim that the court erred by not awarding more pretrial interest for Count I, as that award is vacated in its entirety.

II. The trial court correctly entered the jury's verdict in favor of Taustin on Count II.

The Antigones next point to several reasons they believe the jury's verdict on Count II must be overturned. First, they argue the trial court erred by not requiring Taustin to introduce the testimony of Taustin's expert to the jury. Second, they argue that the court erred by not giving a jury instruction they proposed, and by giving another instruction they opposed.[10] We disagree.

    A. The trial court did not err in permitting Taustin not to read Wheaton's expert testimony to the jury.

"[W]e review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021)

---

[10] The Antigones also argue that the court erred by not granting them summary judgment on Count I, but as we explained above, the court should have granted summary judgment for Taustin. They also assigned error to the court's denial of their post-trial motions to set aside the verdict on Count II. But they waived this argument under Rule 5A:20(e) by providing only four sentences on this topic without reference to any legal authority. *See also Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) ("Unsupported assertions of error 'do not merit appellate consideration.'" (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008))). Even if this point was not waived, the Antigones' brief only reincorporates the other errors they alleged about Count II, each of which we find individually unpersuasive for the reasons discussed elsewhere.

(alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)). "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Id.* (alteration in original) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)).[11]

Taustin designated Professor Wheaton as an expert. Before he testified at trial, the court told the jury:

> The defense wishes to call Professor Wheaton. I am giving them an opportunity to start the questions so I can hear exactly what the questions are, but he is not being offered as a fact witness. So this Court has to manage this presentation as evidence carefully, especially if he is going to talk about issues of law.

After a brief exchange, counsel for Taustin stated that "we could proffer [Wheaton's] testimony outside the presence of the jury. And if [the court] could make determinations as to what is and

---

[11] We first note that there are several alleged procedural issues with this assignment of error. First, while the Antigones originally argued, before and during trial, that Wheaton's testimony should be excluded entirely, they now argue that Taustin was required to introduce into evidence the very testimony to which they objected. Taustin argues on appeal that the Antigones waived this issue by approbating and reprobating. "A litigant cannot 'approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory,' or else such arguments are waived." *Amazon Logistics, Inc. v. Va. Emp. Comm'n*, 304 Va. 107, 114-15 (2025) (quoting *Rowe v. Commonwealth*, 277 Va. 495, 502 (2009)). "The doctrine 'forces a litigant to elect a particular position[] and confines a litigant to the position . . . first adopted.'" *AV Auto., LLC v. Bavely*, 85 Va. App. 559, 577 (2025) (alterations in original) (quoting *Commonwealth v. Holman*, 303 Va. 62, 71 (2024)). Because the Antigones argue on appeal that this was a binding stipulation, and they did not take a contrary position below as to the binding nature of the stipulation, we do not apply this doctrine here.

Second, the Antigones did not immediately raise their objection when counsel for Taustin told the court that he would not be offering Professor Wheaton's testimony to the jury, or when the court told the jury the same thing. In fact, when the Antigones did raise the objection later in trial, the court merely responded, "All right. Thank you." This exchange suggests that the Antigones never obtained a "ruling" on their objection as required by Rule 5A:18. Still, we assume without deciding that they obtained a ruling on this question for the purposes of preservation because the trial court did not err as alleged. *See McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) (assuming without deciding that an issue can be reviewed where it allows the Court "to resolve the appeal on the best and narrowest grounds").

is not admissible and we could curate that and then submit it to the jury."  The court agreed, noting that "what we're going to do is a proffer."  Outside the jury's presence, Taustin's counsel went "through what [they] had planned as direct testimony" subject to the Antigones' objections, and the Antigones then cross-examined Wheaton.  Taustin, however, ultimately decided not to read that testimony to the jury.

As shown above, the court explained that Wheaton's testimony was being proffered for its consideration.  *See Whittaker v. Commonwealth*, 217 Va. 966, 969 (1977) (allowing testimony to be proffered by "giv[ing it] in the absence of the jury and ma[king it] a part of the record").  If Taustin wanted to introduce it later, the testimony would have to be "curate[d]" after the court made "determinations as to what is and is not admissible."  When Taustin decided not to introduce the testimony to the jury, it was akin to withdrawing a proffer.

Furthermore, this was not a binding "stipulation," as argued by the Antigones.  Stipulations of undisputed issues "focus courts on issues that are actually in dispute and promote judicial economy by limiting the issues that are subject to the taking of evidence."  *King William Cnty. v. Jones*, 65 Va. App. 536, 548 (2015).  Here, there was no stipulation of fact, and Wheaton's testimony was far from undisputed—the Antigones objected to it in its entirety.  Thus, the circuit court did not abuse its discretion by declining to force Taustin to introduce evidence he no longer wanted to introduce.

B.  There is no reversible error with respect to the jury instructions.

"A trial court's decision whether to grant or refuse a proposed jury instruction is generally subject to appellate review for abuse of discretion."  *Rodrigue v. Butts-Franklin*, 79 Va. App. 645, 653 (2024) (quoting *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017)).  "But '[a] litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory.'"  *Id.* (alteration in original) (quoting *Hancock-*

*Underwood v. Knight*, 277 Va. 127, 130 (2009)). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

"When we review the content of jury instructions, our 'sole responsibility . . . is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Cain v. Lee*, 290 Va. 129, 134 (2015) (alteration in original) (quoting *Knight*, 277 Va. at 131). "Whether the content of the instruction is an accurate statement of the relevant legal principles is a question of law that, like all questions of law, we review de novo." *Id.* (quoting *Knight*, 277 Va. at 131).

1.  The trial court did not err by giving Instruction C-8.

The Antigones argue that the court erred by instructing the jury that "[u]nder the business judgment rule, a manager is presumed to have acted properly and in good faith in the exercise of his business judgment."

Below, the Antigones objected "to there being a presumption," which they argued was "a questionable statement of law." They also suggested that the deficiency in the instruction might be "offset" with another instruction, which the court ultimately gave. Now on appeal, the Antigones argue (1) that there is no presumption; and (2) that if there is a presumption, it was rebutted, and therefore the jury should not have been instructed about a presumption.

Regarding their first point, the Antigones argue that there is no presumption in Code § 13.1-1024.1, which states the standards of conduct for managers of a limited liability company. This statute contains a statutory business judgment rule. It requires a manager to discharge his or her duties in "accordance with the manager's good faith business judgment of the best interests" of the company. Code § 13.1-1024.1. Another statute mirrors this requirement for corporations.

Code § 13.1-690. The Supreme Court has equated the two statutes, noting that with "virtually identical language" the provisions "afford managers and corporate directors . . . protection from liability in the exercise of that good faith judgment under certain circumstances." *Flippo v. CSC Assocs. III*, 262 Va. 48, 56-57 (2001).

While Code § 13.1-1024.1 does not describe a presumption, the existence of a statutory business judgment rule does not subsume the duties owed by a director under the common law. Indeed, in *Simmons v. Miller*, 261 Va. 561, 577 (2001), the Supreme Court explained that the existence of a statutory business judgment rule for corporations did "not abrogate the common law duties of a director." And elsewhere, the Supreme Court has affirmed that there is a "presumption set forth in the business judgment rule" and that "in an action to review [a] director['s] business decision, the decision itself is also entitled to the . . . presumption." *Lake Monticello Owners' Ass'n v. Lake*, 250 Va. 565, 571-72 (1995). This presumption reflects the principle that courts have a "limited" power to review "the internal management or policies of corporations." *Gottlieb*, 199 Va. at 857. When there is conflicting evidence about an action of a corporation, as long as "there is evidence tending to support the conclusion, the courts will not interfere with the merits of the decision." *Id.* at 858.

Thus, we find that the jury instruction correctly stated the law. Under the common law business judgment rule, "a manager is presumed to have acted properly and in good faith in the exercise of his business judgment." As a result, we disagree with the Antigones that this is a questionable statement of law.

The second argument raised by the Antigones is far more complicated. They argue that, if there is a presumption, it is a "Thayer" (or bursting bubble) presumption[12] and that, when the

---

[12] The Thayer or bursting bubble theory posits "that the only effect of a presumption is to shift the burden of production with regard to the presumed fact." *White v. Llewellyn*, 299 Va. 658, 665 (2021) (quoting *Parson v. Miller*, 296 Va. 509, 525 (2018)). "[O]nce the party against

Antigones introduced evidence showing Taustin had engaged in bad faith, the bubble burst. As a result, any mention of the presumption should not have gone to the jury. The Antigones point to *Parson v. Miller*, 296 Va. 509, 528 (2018), where the Supreme Court held that when a particular presumption was "rebutted and ha[d] 'disappeared,' the jury should not be instructed as to the presumption."[13]

However, this argument—that the presumption here is a Thayer presumption that burst—was not presented below. Rule 5A:18 requires an objection in the lower court to be "stated with reasonable certainty at the time of the ruling." In other words, an objection "must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it." *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). We have also held that "[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for review." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc). Because they failed to make the same argument in the circuit court that they now make on appeal, we cannot consider the Antigones' second argument about the presumption.

To sum up, the trial court did not err by giving Instruction C-8. The statutory business judgment rule in Code § 13.1-1024.1 exists alongside the common law business judgment rule, and the common law rule includes a presumption that a manager acted properly and in good faith in the exercise of their business judgment. So we reject the argument that the instruction was not

---

whom the presumption operates introduces countervailing evidence, the presumption 'disappears like a bursting bubble and no longer has any impact on the trial.' The party who initially benefitted from this presumption still retains the burden of persuasion on the factual issue in question." *Id.* (quoting *Parson*, 296 Va. at 525).

[13] Indeed, some observers have cautioned against mentioning presumptions to the jury. *See, e.g.*, 1 *Weinstein's Federal Evidence* § 301.04 (2026) (discussing the potential problems that may arise by telling the jury about a "presumption").

an accurate statement of the law and therefore cannot reach the question of whether the jury should have been so instructed after the presumption allegedly burst.

2. The trial court did not err by refusing Proposed Instruction 3.

The Antigones further contend that the trial court erred in rejecting their proposed "Instruction No. 3," which provided in relevant part that "[a]n act which is otherwise legal or within the authority of the manager may, nevertheless, breach the manager's fiduciary duty." They argue that (1) the instruction is a correct statement of the law; and (2) it was necessary to help the jury understand that, while Taustin may have had legal authority to act, his action could nevertheless still violate his fiduciary duties.[14]

The first question is whether Proposed Instruction 3 was an accurate statement of the law. Although the Antigones only assign error to the trial court's refusal to instruct the jury with the final sentence, Proposed Instruction 3 stated in full:

> When a manager resorts to an informed decision-making process as a defense to the alleged breach of duty, the ultimate decision must still reflect his good faith business judgment of the best interests of the limited liability company. The fact that the advice upon which a manager acted involved acts which could legally be taken by the manager is irrelevant to whether the act was taken with the intent of benefiting the company or was taken in accordance with the manager's good faith business judgment of the best interests of the limited liability company. *An act which is otherwise legal or within the authority of the manager may, nevertheless, breach the manager's fiduciary duty.*

(Emphasis added).

---

[14] Taustin argues that the Antigones waived this assignment of error, but "[w]hen a trial court refuses to give an instruction proffered by a party that is a correct statement of law and which is supported by adequate evidence in the record, this action, without more, is sufficient to preserve for appeal the issue of whether the trial court erred in refusing the instruction." *Emergency Physicians of Tidewater, PLC v. Hanger*, 303 Va. 77, 87 (2024) (emphasis omitted) (quoting *Commonwealth v. Cary*, 271 Va. 87, 98 (2006)).

The Antigones relied on *Flippo* for the instruction. 262 Va. at 56-57. In that case, the Flippos argued that the trial court erred in finding Carter Flippo liable "for a breach of fiduciary duties for acts taken in reliance on legal advice." *Id.* at 56. The Supreme Court held that, to be shielded by Code § 13.1-1024.1(B), the legal advice "received and acted upon must have been advice sought in good faith for the benefit of the company." *Id.* at 57. As a result, the Court rejected as "irrelevant" the Flippos' argument that "advice upon which [the party] acted involved acts which could 'legally' be taken by a manager." *Id.* In this context, the Court explained that "an act which is otherwise legal may, nevertheless, breach one's fiduciary duty." *Id.*

The instruction proposed by the Antigones, especially when viewed in its entirety, tracks the language from the *Flippo* case. *Id.* Therefore, it is an accurate statement of the law. But we are mindful of "the danger of the indiscriminate use of language from appellate opinions in a jury instruction." *Cain*, 290 Va. at 135 (quoting *Blondel v. Hays*, 241 Va. 467, 474 (1991)). Even if the instruction correctly states the law, a trial court may properly still refuse to give it. Indeed, "a court may exercise its discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other granted instructions fully and fairly cover the relevant principle of law." *Watson*, 298 Va. at 207 (quoting *Payne*, 292 Va. at 869).

Turning to the second issue raised by the Antigones, the point of *Flippo* is that a manager cannot be shielded by the business judgment rule unless the manager acted in good faith and on behalf of the company. 262 Va. at 56-57. In other words, the rule only protects acts related to the exercise of business judgment on behalf of the company of which he or she was the manager. *Id.* at 57. The line in *Flippo* that the Antigones rely upon—expressing that a legal act could have been taken in bad faith and against the company's interests—is just a specific application of this general principle.

The other jury instructions more than adequately covered the general principle. Instruction C-4 stated that "[t]he business judgment rule offers no protection to a manager who has not exercised his business judgment on behalf of the LLC." And Instruction C-8.5 stated that "[a] manager breaches his fiduciary duty if he discharges his duties not in accordance with his good faith business judgment of the best interests of the companies." These instructions "fully and fairly cover the relevant principle of law," *Watson*, 298 Va. at 207, which here was the scope of the business judgment rule's protection.

The Antigones, therefore, fail to show that the trial court abused its discretion by refusing Proposed Instruction 3. While the instruction was an accurate statement of the law, other instructions already conveyed the operative legal principle.

III. The trial court erred in sustaining Taustin's demurrer on Count III.

In their final assignment of error, the Antigones argue that the trial court erred in sustaining Taustin's demurrer to Count III. That count alleged that Taustin breached his fiduciary duty by causing DGA to incur litigation costs in the Section 10.1 Case, which sought to make Chris forfeit his economic interest in the company—a goal that would only personally enrich Taustin. Count III also requested reimbursement of such costs.

"The purpose of a demurrer is to determine whether a motion for judgment states a cause of action upon which the requested relief may be granted. A demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof." *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 557 (2011) (quoting *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 356-57 (2010)). "In reviewing a circuit court's decision to grant a demurrer, 'we accept as true all properly pled facts and all inferences fairly drawn from those facts.'" *Padula-Wilson v. Landry*, 298 Va. 565, 574 (2020) (quoting *Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 204 (2007)). "This Court reviews the sustaining of a demurrer de novo." *Id.*

- 24 -

A claim for breach of fiduciary duty requires proof of duty, breach, causation, and damages. *Carstensen v. Chrisland Corp.*, 247 Va. 433, 444 (1994). The essential issue here is whether the Antigones sufficiently alleged that Taustin breached his duty to DGA. "A manager, like a corporate director, is required to discharge his duties in accordance with his 'good faith business judgment of the best interests of the limited liability company.'" *Flippo*, 262 Va. at 56 (quoting Code § 13.1-1024.1(A)).

If a party can breach their fiduciary duty to a limited liability company by failing to exercise "good faith business judgment of the best interests of the limited liability company," *id.* at 56, Count III sufficiently alleges such a breach. The Antigones alleged that Taustin breached his fiduciary duty by "willful[ly] and malicious[ly]" "caus[ing] DGA to invoke Section 10.1 in an improper attempt to seize [Chris's] membership interests in DGA and enrich himself personally." This claim was supported by the factual allegations that:

- Taustin "mischaracterized" Chris's disassociation as a "pretext to claim that [the] dissociation resulted in the forfeiture of his entire economic interest in DGA."
- Taustin acted "out of malice and greed, and in furtherance of [Taustin's] personal goal to enrich himself and injure [Chris] Antigone" by increasing and decreasing respectively their economic interests in the company.
- Taustin incurred substantial legal fees from the Section 10.1 Case "even though the Company had no interest at stake in whether [Chris] Antigone retained his membership interest following his dissociation."

These allegations raise a question of fact as to whether Taustin intended to advance DGA's best interests or his own best interests. *Allen Realty Corp. v. Holbert*, 277 Va. 441, 443-44 (1984).

In sustaining the demurrer, the trial court also seemingly failed to "accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to the claimant." *Young-Allen v. Bank of Am., N.A.*, 298 Va. 462, 467 (2020) (quoting *Parker v. Carilion Clinic*, 296 Va. 319, 330 (2018)). Instead, the trial court explained

- 25 -

that Taustin's bringing the Section 10.1 Case was not "frivolous" even though he was ultimately unsuccessful in the action. The court, based on its familiarity with the prior litigation, also concluded that the Companies had received some benefit from Taustin's actions because they led to the cessation of litigation between the parties.

But the complaint alleged that Taustin initiated the Section 10.1 Case for reasons that were not in DGA's best interests. The trial court erred by disregarding these allegations and relying on its own assessment of whether the prior litigation had helped or hurt DGA. In effect, the court "decide[d] the merits of the allegations set forth" in the complaint, even though that is not the "function of the trial court" at "the demurrer stage." *Young-Allen*, 298 Va. at 467 (quoting *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 514 (2014)). Indeed, the trial court explicitly noted that "this claim would still not have survived summary judgment, a motion to strike or a motion to set aside an adverse verdict." That conclusion may be true, but the only function of the trial court when considering a demurrer is "to determine whether the factual allegations pled and the reasonable inferences drawn therefrom are sufficient to state a cause of action." *Young-Allen*, 298 Va. at 467 (quoting *Squire*, 287 Va. at 514).[15]

Taustin's counterarguments here are unavailing. First, Taustin argues that the complaint did not allege a breach of fiduciary duty because "the Section 10.1 Case already litigated the propriety of Taustin's actions under that section," and the Antigones essentially sought to "re-litigate what was resolved in" that case. Even assuming that is true, however, Taustin effectively is asserting res judicata—an affirmative defense that should be raised as a plea in bar and not in a

---

[15] What is more, the fact that Taustin's actions were not frivolous and that the Companies may have benefited from the end of litigation do not, on their own, prove that Taustin acted in the Companies' best interests. *See, e.g.*, *Flippo*, 262 Va. at 57 (concluding that a manager must have acted in good faith and on behalf of the company and noting that "an act which is otherwise legal may, nevertheless, breach one's fiduciary duty").

demurrer. *See Cal. Condo. Ass'n v. Peterson*, 301 Va. 14, 20 (2022) (discussing the difference between a demurrer and a plea in bar).[16]

Then, Taustin argues that the complaint really claims injury to Chris, not to DGA. He points to *Gowin v. Granite Depot, LLC*, 272 Va. 246 (2006), where a manager's actions arguably harmed certain members but did not negatively impact the company or breach the manager's fiduciary duties. But that case was not resolved on a demurrer. In this unique procedural posture, we are limited to reviewing the complaint, and on its face, the complaint alleges that Taustin's pursuing the Section 10.1 Case caused "DGA [to] incur hundreds of thousands of dollars in fees . . . even though the Company had no interest at stake in whether Antigone retained his membership interest following his dissociation."

"Whether an act constitutes a breach of fiduciary duty will depend on the circumstances of each case." *Gowin*, 272 Va. at 258. And those circumstances cannot be flushed out by demurrer here. For these reasons, the trial court erred in sustaining the demurrer to Count III.

CONCLUSION

The trial court's decisions are affirmed in part and reversed in part. We reverse the court's decision to let Count I go to trial, as summary judgment should have been granted in favor of Taustin. We remand for the court to enter final judgment for Taustin, thus resolving Count I. We affirm the court's imposition of the jury's verdict in favor of Taustin on Count II. But, because the Antigones pleaded a viable claim for breach of fiduciary duty, we reverse the court's decision to sustain Taustin's demurrer on Count III and remand for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

---

[16] We add that, as the Antigones have argued, Taustin was not strictly "required" to invoke Section 10.1 given the consent to continue provision.